This is an appeal of a judgment declaring the rights of the parties under a lease of real property. On March 22, 1999, Gulf States Paper Corporation ("Gulf States") filed a declaratory-judgment action against River Conservancy Company, L.L.C. ("River Conservancy"). On October 27, 2000, the trial court entered a declaratory judgment in favor of Gulf States. River Conservancy appeals from that judgment.
 I. Facts
On May 19, 1969, Gulf States entered into a timber purchase agreement with E.O. Eddins and Anne E. Eddins. Pursuant to the agreement, the Eddinses conveyed to Gulf States all of the timber on a tract of land in Sumter County, hereinafter referred to as "the Eddins tract." The purchase agreement provided, in pertinent part:
 "Sellers hereby convey unto Buyer all of the existing timber of all sizes and descriptions, including all seedlings, saplings, trees, stumps and other forest growth, regardless of size or species. . . ."
The purchase agreement gave Gulf States 40 years from the execution of the contract to remove all timber and forest products conveyed by the purchase.
On the same day, Gulf States entered into a lease agreement with the Eddinses, for a term of 40 years, beginning on May 19, 1969, and ending on May 18, 2009.[1] The lease agreement provided, in pertinent part:
 "2. During the term of this Lease, Gulf States shall have all rights to grow, cut and to remove timber from the Premises (in addition to the timber separately conveyed by a timber purchase agreement between the parties hereto as of this date), and shall have the full and complete possession, use, control and enjoyment of the Premises, and all possessory rights with respect thereto, including agricultural rights, except only those rights hereinafter specifically reserved to Lessors.
 "Without limiting the generality of the foregoing, Gulf States shall have the *Page 803 
 right to protect, cultivate, spray, thin, deaden and otherwise manage all timber and timber products on the premises and to cut, harvest, mill and process all timber and timber products . . . which are now growing or shall come into existence during the term of this lease (in addition to the timber separately conveyed by the timber purchase agreement between the parties hereto as of this date), or to contract with others for such acts to be done, and to use, sell, or otherwise dispose of such timber and timber products for its benefit in such manner as it may elect."
Paragraph 19 of the lease agreement provided:
"Seed Trees
 "19. For the purpose of re-stocking the land following the final harvest cut Gulf States will select from the then existing stand of timber a minimum of five (5) dominant or co-dominant trees per acre to be left as seed trees."
On April 2, 1997, Martha Anne Eddins Kelly, an heir of E.O. Eddins and Anne E. Eddins, assigned the lease agreement to Bony F. Barrineau. On April 16, 1997, Kelly conveyed the Eddins tract to Bony F. Barrineau by warranty deed. This conveyance was subject to the timber purchase agreement and the lease between Gulf States and the Eddinses. On May 21, 1997, Barrineau conveyed the Eddins tract to River Conservancy. This conveyance was also subject to the timber purchase agreement and the lease. The warranty deed expressly reserved Kelly's right to receive proceeds under the timber purchase agreement.
In 1998, Gulf States decided to exercise its rights under the timber purchase agreement to harvest timber on the Eddins tract. Representatives of Gulf States met with representatives of River Conservancy to discuss the timber harvest; however, a controversy arose over the restocking of the harvested timber. Specifically, a controversy arose over whether the "seed-tree" provision in paragraph 19 of the lease agreement applied to both hardwood trees and pine trees. River Conservancy claimed that paragraph 19 of the lease agreement required that Gulf States leave both hardwoods and pine trees on the property as seed trees. Gulf States contended that paragraph 19 referred only to pine trees, requiring that it select a minimum of five dominant or codominant pine trees per acre to be left as seed trees. According to Gulf States, at the time the lease was executed, hardwood trees were not regenerated using the "seed-tree" method; thus, Gulf States contended, at the time it entered into the lease agreement with the Eddinses, both parties intended that Gulf States was entitled to harvest all of the hardwood on the tract, and it was required to leave only pine seed trees after its final harvest.
As a result of the disagreement between the parties, Gulf States sought a judgment declaring the rights, status, obligations, and liabilities of Gulf States and River Conservancy with respect to the lease agreement and the timber purchase agreement. The complaint also requested the court to declare that Gulf States had the right under the lease agreement and the timber purchase agreement to harvest all timber on the Eddins tract and, after the final harvest cut, to restock the land using currently accepted forestry practices to be selected by Gulf States without interference by River Conservancy. Finally, Gulf States' complaint asked the court to declare that River Conservancy did not have a right to obtain Gulf States' plans and proposals regarding its timber management and timber harvesting. *Page 804 
River Conservancy filed an answer and a counterclaim, asking the court to determine which trees Gulf States could and could not harvest; the extent to which River Conservancy was entitled to have knowledge of, and participate in, Gulf States' plan to harvest the timber; the scope of Gulf States' seed-tree-regeneration obligations to River Conservancy; the extent to which the lease agreement required Gulf States to respect and preserve River Conservancy's hunting and fishing rights on the Eddins tract; the extent to which River Conservancy was permitted to withdraw disputed parcels from any proposed harvest of timber; and the extent to which both parties were obligated to comply with environmental laws and principles existing to protect the land.
During the trial of the case, Gulf States presented two proposed timber-harvest cutting plans. Those plans were entitled "Timber Harvest Proposal Number One" and "Timber Harvest Proposal Number Two." Timber Harvest Proposal Number One would allow Gulf States to harvest 3 of the 16 compartments on the Eddins tract per year from 2001 through 2003. The plan provided for a harvest of two compartments in 2004, and one compartment per year from 2005 through 2009.
Timber Harvest Proposal Number Two would allow Gulf States to perform select cutting through each of the 16 compartments in the first 3 years, from 2001 through 2003. During this process Gulf States would cut and remove some of the timber it had purchased in 1969. The plan provided for a final harvest from 2004 through 2009, during which Gulf States would harvest all the timber in the hardwood areas and leave a minimum of five dominant or codominant seed trees in the pine-tree areas.
After a hearing on the matter, the trial court entered a judgment for Gulf States. The court concluded that Timber Harvest Proposal Number Two was "in keeping with the spirit and plain language of the lease." However, the court ordered Gulf States to leave both hardwood and pine seed trees to restock the Eddins tract. The court found that River Conservancy had actual notice of the existence of the timber purchase agreement and the lease agreement before it purchased the property and that it knew that the property was subject to the terms of the timber purchase agreement and the lease agreement. The court concluded that Gulf States had the right under the timber purchase agreement and the lease agreement to go upon the land to cut and remove timber to which it is entitled as a preliminary cut or cuts, leaving a sufficient number of hardwood trees and pine trees from which to select seed trees at the final harvest. The court held that Gulf States may return to conduct a final harvest cut before the lease expired and at that time shall select and leave at least five dominant or codominant seed trees per acre from the then existing stand. The court appointed Jim Jeter, an employee of the Alabama Forestry Commission, or his successor in office, to supervise Gulf States' final cut of the timber to ensure that the trees selected to be left are seed trees and that they are dominant or codominant trees of the then existing stand.
 II. Did the trial court improperly consider extrinsic evidence to determine the intent of the parties at the time of the execution of the lease?
At trial Gulf States argued that paragraph 19 of the lease agreement was ambiguous because, it said, the provision did not specify the species of the seed trees it was required to leave after the final harvest. The trial court, in apparent agreement, allowed Gulf States to present several witnesses who testified that the *Page 805 
term "seed tree" as that term was used in 1969 did not apply to hardwoods. The trial court also allowed Jack Loper, the vice president in charge of forestry at Gulf States when Gulf States entered into the lease agreement, to testify as to which species of trees Gulf States had intended that paragraph 19 refer to. Loper testified that the lease agreement was a form lease document Gulf States had used when there were pine trees on the land being leased. Loper testified that provisions such as paragraph 19 were not included in leases for land that had no pine trees on it. Loper also testified that at the time of the execution of the lease agreement, Gulf States did not intend for paragraph 19 to apply to hardwood trees. River Conservancy argues that the trial court improperly considered extrinsic evidence to determine the intent of the parties at the time of the lease.
Whether a contract is ambiguous is a question of law for the court to determine. Haddox v. First Alabama Bank, 449 So.2d 1226, 1229 (Ala. 1984). Ambiguity exists when a term is reasonably susceptible to more than one interpretation. Cannon v. State Farm Mut. Auto. Ins. Co.,590 So.2d 191, 194 (Ala. 1991). If a court determines that a contract is ambiguous, extrinsic evidence will be allowed to clarify the contract.Poole v. Henderson, Black Greene, Inc., 584 So.2d 485, 487 (Ala. 1991). Paragraph 19 of the lease agreement required Gulf States to leave five dominant or codominant trees per acre as seed trees following its final harvest cut. The provision did not specify whether the term "seed trees" referred to a particular species. Paragraph 19 could reasonably be interpreted to apply to only pine trees, only hardwood trees, or both pine and hardwood trees. Thus, the trial court did not err in considering extrinsic evidence to determine the meaning of paragraph 19. Furthermore, although River Conservancy argues that paragraph 19 was not ambiguous, in its brief River Conservancy concedes that paragraph 19, when read in light of the timber purchase agreement, was in need of resolution by judicial construction. Thus, River Conservancy concedes that paragraph 19 was ambiguous.
Based upon the extrinsic evidence introduced by Gulf States, the trial court ordered Gulf States to leave both hardwood and pine trees as seed trees, in effect ruling against Gulf States and in favor of River Conservancy regarding the interpretation of paragraph 19. River Conservancy had argued that paragraph 19 applied to both pine and hardwood trees. Upon consideration of the evidence, the trial court ordered that Gulf States leave both pine and hardwood seed trees after the final harvest. Thus, not only did the trial court not err in receiving extrinsic evidence, the trial court's ruling based on the consideration of extrinsic evidence to determine the meaning of paragraph 19 benefited River Conservancy.
III. Did the trial court comply with the Declaratory Judgment Act?
River Conservancy also contends that the trial court's declaratory judgment did not meet the requirements of the Alabama Declaratory Judgment Act, § 6-6-220 et seq., Ala. Code 1975. According to River Conservancy, § 6-6-222, Ala. Code 1975, requires that declaratory-judgment actions falling within the statute result in a "final judgment" that declares "the rights, status, and other legal relations whether or not further relief is or could be claimed." River Conservancy argues that the trial court failed to comply with § 6-6-222
because, according to River Conservancy, the court misconstrued the issues in controversy, misstated the parties' relative positions as to the uncontroverted facts, failed to resolve disputed facts, and improperly *Page 806 
adopted as its judgment a settlement proposal by Gulf States that did not fully delineate the relative rights and responsibilities of the parties.
The trial court heard this case without a jury.
 "Under the `ore tenus rule,' a presumption of correctness accompanies the trial court's judgment when it has made findings of fact based on disputed oral testimony without a jury, and its judgment will not be reversed unless it is shown to be plainly and palpably wrong, considering all of the evidence and all inferences that can be logically drawn from the evidence."
Alabama Highway Dep't v. Stuckey's/DQ of Grand Bay, Inc., 613 So.2d 333,335 (Ala. 1993); see also Coghlan v. First Alabama Bank of BaldwinCounty, N.A., 470 So.2d 1119, 1122 (Ala. 1985). The trial court's judgment in cases where the evidence is heard ore tenus will be affirmed, if, under any reasonable aspect of the testimony, there is credible evidence to support the judgment. Pforr v. Intercorp, Inc.,577 So.2d 1291, 1293 (Ala. 1991). Furthermore, the presumption of correctness is coupled with the wide discretion vested in the trial judge in declaratory-judgment actions. Continental Cas. Co. v. City RealtyInc., 673 So.2d 399 (Ala. 1995). Section 6-6-222, Ala. Code 1975, does not require a declaratory judgment to conform to any strict guideline or any particular form. The provision states only that "[t]he declaration may be either affirmative or negative in form and effect," vesting wide discretion with the trial court. See § 6-6-222, Ala. Code 1975; see also Continental Cas. Co., supra.
Gulf States presented several witnesses who testified that in 1969 hardwoods were not regenerated using the seed-tree method. The witnesses testified, nonetheless, that if the court interpreted paragraph 19 of the lease agreement to require that Gulf States regenerate the timber on the Eddins tract by leaving both pine and hardwood seed trees, both the pine trees and hardwood could be restocked by implementing Timber Harvest Proposal Number Two. Mark Key, a district forester employed by Gulf States, testified that in 1969 the seed-tree method of regeneration was not used to restock hardwoods. Key testified that hardwoods were regenerated by letting them sprout. Key described both Timber Harvest Proposal Number One and Number Two and testified that Gulf States could implement Timber Harvest Proposal Number Two leaving both hardwood and pine seed trees.
James Jeter, a regional forest-management specialist with the Alabama Forestry Commission, testified that he had been working in the field of forestry since 1976. Jeter testified that there were basically four methods of regeneration for hardwoods, including regeneration from a stump left after a cut, from seeds that lay dormant in the ground, from root sprouts from shade intolerant trees after removal of the canopy, and from advanced regeneration — growth in smaller-sized trees that have been suppressed because of lack of sunlight. Jeter testified that in his opinion, the best method of regeneration of hardwoods is the advanced-regeneration process. Jeter testified that in his opinion the hardwood areas of the Eddins tract could be regenerated using Timber Harvest Proposal Number Two.
John Hodges, a forest-management consultant, testified that he had worked almost exclusively with hardwoods over the last 25 years as a forester employed by the United States Forest Service and as a professor of silviculture at Mississippi State University. Hodges testified that in 1969, no one, to his knowledge, restocked hardwood forests by leaving seed trees. *Page 807 
According to Hodges, the seed-tree method was the preferred method for regenerating most of the pine species. Hodges testified that the better way to regenerate the hardwood on the Eddins tract would be to implement Timber Harvest Proposal Number Two — which would allow Gulf States to first perform selective cutting, leaving a stand of trees to grow for another two to four years using the advanced-regeneration method and then coming back to do a final cut. Hodges testified that Timber Harvest Proposal Number Two could restock the forest without leaving seed trees, but that Gulf States could also leave seed trees during this process.
Tom Cambre testified that he had been a forester since 1967. Cambre testified that in 1970 he began working with the Alabama Forestry Commission as a forester and two years later he became the statewide hardwood specialist. Cambre also testified that he had extensive experience in pine-tree management. Cambre testified that in 1969 hardwood timber was not regenerated by seed trees. According to Cambre, in 1969 hardwoods were regenerated primarily by diameter limit cutting. Cambre testified that the best way to regenerate hardwood is by natural regeneration, which begins with advanced regeneration. Cambre testified that if Timber Harvest Proposal Number Two was followed and Gulf States did a preliminary cut and four to five years later a second cut from which seed trees were left, the Eddins tract would be restocked.
River Conservancy presented several witnesses who testified that the seed-tree method has been used to regenerate hardwood trees; however, none of the witnesses testified that if Timber Harvest Proposal Number Two was implemented, the Eddins tract would be restocked with both pine and hardwood trees. David Austin, a forestry consultant and timberland manager, testified for River Conservancy. Austin testified that he had extensive experience in hardwood management. Austin testified that he had been using the seed-tree method for the regeneration of hardwoods for almost 10 years.
Billy Callahan, the vice president of a timberland management company also testified for River Conservancy. Callahan testified that he had gained significant experience in hardwood forestry while working for Sears, Roebuck and Co.'s forestry department in Mississippi. Callahan testified that he had used the seed-tree method of hardwood regeneration for approximately 10 years. Callahan testified that he had visited the Eddins tract and that, of the hardwood trees preliminarily marked to be left as seed trees, Gulf States had marked the less valuable sweet-gum trees.
The record indicates that the trial court had before it adequate evidence upon which to determine that Timber Harvest Proposal Number Two could be implemented in accordance with the timber purchase agreement and the lease agreement, thereby restocking the Eddins tract with both hardwoods and pine trees. Furthermore, the trial court did not err by refusing to enter a judgment detailing a more precise plan for the removal of the timber purchased by Gulf States than the plan delineated by Timber Harvest Proposal Number Two. The lease agreement provided that Gulf States had the right "to cut, harvest, mill and process all timber and timber products . . . in such manner as it may elect." (Emphasis added.) The plain language of this provision allowed Gulf States wide discretion in determining how it could cut and harvest the timber that it had purchased on the Eddins tract, as long as that method adequately restocked the Eddins track with both hardwoods and pine trees. *Page 808 
The trial court fairly and wisely resolved a difficult dispute. The evidence in the record and the agreements before the court sustain its findings. Accordingly, the judgment of the trial court is affirmed.
AFFIRMED.
Moore, C.J., and Houston, Johnstone, and Woodall, JJ., concur.
[1] This term was later extended by agreement between Gulf States and River Conservancy, as successor in interest to the Eddinses, to October 13, 2010.