THOMAS, Judge.
 

 J.A. (“the mother”) appeals from the Etowah Juvenile Court’s judgment terminating her parental rights to J.E.A. (“the child”). The mother was 13 years old when she gave birth to the child, who was conceived when the mother’s father, M.A., sexually assaulted the mother. The mother gave birth to the child at home on March 23, 2006, and she and M.A. then went to the hospital with the intent of placing the child for adoption. At the hospital, the Etowah County Department of Human Resources (“DHR”) took custody of the child, who remained in the hospital because he was a newborn and only weighed 3 pounds, 12 ounces at birth. M.A. withdrew his consent to the adoption of the child later that day when he was asked to give a DNA sample. Two days later, M.A. attempted suicide in the family home, in the presence of his wife, M.F.A. (“the maternal grandmother”), and his children, including the mother. M.A. was arrested and charged with domestic violence.
 

 The mother and her sister, Je.A., were interviewed by a forensic interviewer, Sarah Wilhite, at which time the mother disclosed that she had been molested by M.A. At that time, Je.A. denied that she had been sexually abused by M.A.; however, in a follow-up interview in May 2006, Je.A. admitted that M.A. had molested her as well, although she denied that he had had sexual intercourse with her. M.A. was ultimately charged with and convicted of crimes related to the sexual abuse of the mother and Je.A. and was incarcerated.
 

 As noted above, DHR took custody of the child when the mother and M.A. relinquished custody at the hospital on March
 
 *1247
 
 23, 2006. Although M.A. informed the hospital later that same day that he did not wish to consent to the child’s adoption, the child remained in DHR’s custody and was ultimately placed in a foster home. At an April 14, 2006, Individualized Service Plan (“ISP”) meeting, the mother informed DHR that she wished to be reunited with the child. Because the mother was a minor and could not provide for and rear the child on her own, DHR focused on the maternal grandmother as the person to be considered responsible for the care of the child if he were to be reunited with the mother. Thus, DHR provided services for the mother and the maternal grandmother.
 

 The DHR caseworker assigned to the family, Beverly Bankston, testified at trial regarding the family’s progress and the decision to seek a termination of the mother’s parental rights. Bankston explained that she had been concerned early in her involvement with the family when the maternal grandmother and the mother expressed a desire to see M.A. while he was incarcerated in the county jail. Bankston noted that it appeared that the maternal grandmother did not see a problem with letting the mother visit M.A. despite the risk that M.A. might attempt to convince the mother to recant her accusation that M.A. had sexually assaulted her. According to Bankston, the mother had difficulty choosing a name for the child, which Bank-ston indicated raised concerns about the mother’s desire to bond with the child. In addition, Bankston recounted early difficulty with scheduling visitation between the mother and the child.
 

 According to Bankston, the maternal grandmother and the mother expressed concern over what they would tell friends and family about the child’s parentage. The maternal grandmother was pregnant when the child was born; she gave birth to her infant daughter, I.A., only two months later in May 2006. Bankston said that the maternal grandmother had originally planned to pass the child off as her own, despite the implausibility of such an explanation. In addition, in the summer of 2007, the mother and maternal grandmother canceled a visit with the child because the child’s maternal great-grandmother and other family members were visiting and they did not want to explain the child’s parentage to the maternal great-grandmother. Bankston indicated that this caused her great concern because she could not see how the maternal grandmother and mother could continue to hide the existence of the child if he were reunited with his mother and placed in the maternal grandmother’s care.
 

 Bankston expressed further concern over the maternal grandmother’s fitness as an alternative custodian for the child based upon the maternal grandmother’s reaction to Je.A.’s disclosure of abuse. Bankston described the maternal grandmother’s reaction as “nonchalant.” When JeA. indicated that she was suffering from feminine itching, Bankston recounted, the maternal grandmother seemed reluctant to take JeA. to a physician to be examined. When DHR referred JeA. to what the transcript refers to as “SCHIPS,” which we believe to be a reference to the Children’s Hospital Intervention and Prevention Services (“CHIPS”) team, Bankston said that the maternal grandmother first requested that DHR take JeA. to the appointment because the maternal grandmother did not want to go. DHR provided transportation for the maternal grandmother and Je.A., and the maternal grandmother did attend the appointment.
 

 The maternal grandmother’s insistence that she did not need the counseling recommended by DHR also troubled Bank-ston. Bankston said that the maternal grandmother had stated that the abuse
 
 *1248
 
 was in the past and that she had forgiven M.A. However, the maternal grandmother did tell Bankston that, if she felt she needed counseling at some time in the future, she would seek pastoral counseling. The maternal grandmother refused to sign a release form permitting DHR to talk with the pastor about any counseling he might give the maternal grandmother. The maternal grandmother also indicated that she might consider allowing M.A. to return to the home if he were released from prison.
 
 [1]
 
 Bankston said that the maternal grandmother also did not encourage the mother or Je.A. to continue counseling, which the maternal grandmother said the mother and Je.A. found “boring.” Bankston noted that the mother, like the maternal grandmother, indicated that she had no need for counseling because the abuse was “in the past” and “forgotten.” The resistance to counseling and the maternal grandmother’s indication that M.A. might be permitted to return to the family home, according to Bankston, indicated the maternal grandmother’s lack of understanding about the emotional trauma of sexual abuse and showed, in Bankston’s opinion, a lack of insight and judgment on the part of the maternal grandmother.
 

 Other concerns raised by Bankston included concerns that the maternal grandmother was always comparing her youngest daughter, I.A., with the child in a negative manner. Bankston expressed concern that, to the maternal grandmother, the child would never be as good as I.A. This constant comparison of the two children, Bankston said, caused DHR to believe that the child would always carry a stigma in the maternal grandmother’s eyes. Bankston also noted that it appeared that the maternal grandmother had not bonded with the child.
 

 In addition, Bankston said that she questioned the maternal grandmother’s
 
 *1249
 
 parenting skills. According to Bankston, DHR had had contact with the family in 1997 when the maternal grandmother and M.A. left the mother and her older brother alone in the home, when they were aged five and six, respectively. Also troubling to Bankston was the maternal grandmother’s decision to kick two older children who were in M.A.’s custody, A.S. and J.S., out of the family home in January 2008 instead of disciplining A.S. for coming home too late.
 

 Bankston testified that the maternal grandmother made and sold tamales and that this home business was her only source of income.
 
 [2]
 
 The maternal grandmother did receive food stamps. According to Bankston, the maternal grandmother was unable to provide income verification at any time during the 20-month period during which DHR provided services to the family. Bankston did admit that the home was never without necessary utilities and that the family did not go without food at any time during that same period.
 

 Elizabeth Pierce, a case aide who supervised visits with the child, testified that most of the visits with the family had gone well. However, she said that she had been concerned with the maternal grandmother’s use of what appeared to be a turkey fryer — a large pot suspended over an open propane flame — to prepare chicken in the home. Pierce stated that the fryer was intended to be used out doors but that the maternal grandmother used it in her small kitchen. In addition, Pierce testified that during one overnight visit, which occurred in the spring of 2007, the child’s foster mother suspected that the mother was not giving the child his medication. In order to prove her suspicion, the foster mother marked the medicine bottle to denote the level of medication in the container when she relinquished the child for visitation; when the child was returned from the visit, the level of medication in the bottle was unchanged. Michelle Watkins, another case aide who transported the child on occasions when Pierce was unavailable, testified that the mother had failed to utilize the baby bed provided to her by DHR and had instead allowed the child to sleep in her bed with her; Watkins said that she explained to the mother that allowing the child to sleep in bed with an adult was a safety risk. Pierce testified that in the summer of 2007 the child had begun to cry whenever she arrived at the foster parents’ home to pick him up for visitation. According to Pierce, she has had to “peel” the child away from the foster mother at times. However, Pierce did say that the child settled down in the car and that the visits proceeded without further incident.
 

 Chief among the services DHR provided to the family was parenting classes, which were first provided by Janet Coello, who served the family from November 2006 to February 2007. Coello explained that early sessions with the family focused mostly on the explanation of concepts regarding finances, personal responsibility, safety and the protection of family, health, and the care and feeding of the child. Coello noted that the family’s cultural heritage required her to show more respect for the maternal grandmother, who was the matron of the family, and that she tried to be sensitive to the maternal grandmother’s feelings during each session. Coello opined that the family made very little progress during the classes. She specifically noted in a letter to DHR that the family was reluctant to implement the ree-
 
 *1250
 
 ommendations made to them and that they did not reach an acceptable level of progress.
 

 Coello recounted one session in which the maternal grandmother indicated a willingness to reunite with M.A., after which statement the mother became upset and cried. Coello also recounted a session in late January 2007 when the maternal grandmother, in response to comments regarding providing a safe home environment in which the children would feel secure, stated:
 

 “We don’t have any problems. I’m tired of people telling me this. My husband had a drinking problem, but he had never abused any of the children. I never had any concerns about leaving him with the children. He only abused [the mother] once, and he was drunk.”
 

 Coello also echoed some of Bankston’s concerns, noting that the maternal grandmother had indicated that there was no room to consider outside counseling because the issue was a family issue; Coello noted that it appeared difficult to get the maternal grandmother to see the impact of the sexual abuse on the family.
 

 According to Coello, the maternal grandmother resisted working on lessons regarding finances and seemed to be threatened by questions concerning her income. Coello noted that the maternal grandmother had not used a form or a log that Coello had provided to help her track the income she generated with her tamale sales. Coello, like Bankston, said that she never was able to determine the income the maternal grandmother produced through her home business.
 

 The mother, who was in the ninth grade at the time of the trial, testified at trial that she wanted to be reunited with the child. She explained that she did not hate M.A. for what he had done to her; that he had been “good in the good time”; nd that “we can’t do nothing about” the “bad times, like what happened,” because “that’s the past, you know.” She said that she did not really know how to answer the question whether she would want to live with M.A. again. When asked about whether she cried when discussing with Coello the possibility of M.A. returning to the home, the mother said that she had cried on that date for the first and only time. The mother never fully explained the reason that she cried on that date, but she expressed a dislike for having to repeatedly discuss the sexual abuse.
 

 When asked how she would explain having a child if the child were returned to the family, the mother said that many people already knew about the child and his parentage. However, she said that she would tell those friends and family members that did not already know that the child was hers and that if they had a problem with that, they would have to deal with it. The mother also explained why she and the maternal grandmother had chosen not to have a visit with the child when the maternal great-grandmother had visited:
 

 “She is very different from commonly people. You might think: ‘Oh, well, I’m so sad that happen to you,’ but, you know, she would be the type of person that would say, ‘Give that baby up for adoption,’ and we don’t want her to say that, because we want the baby. So we — That’s why we canceled the visitation, because we didn’t want that to happen.”
 

 According to the mother, her household at the time of trial consisted of the maternal grandmother, her older brother A.A., her younger sisters Je.A. and I.A., and her younger brother D.A. When asked if she had spoken with Je.A. about M.A.’s sexual abuse, the mother said that she had told Je.A. that she would get over it and that she should not “remind herself constantly”
 
 *1251
 
 about the abuse. The mother said that she had talked with Je.A. about the abuse only twice — right after the May 2006 interview and again about two months later.
 

 The mother said that she had dealt with the abuse she had suffered the same way she had advised Je.A. to deal with it. She explained that “I don’t see no reason why bringing it back, and that’s why I want to get [the child].” In addition, although inconsistent with her statement that she wanted to put the abuse behind her and to forget that it had ever happened, the mother said that she wanted to “face my fear and live with my child.”
 

 The maternal grandmother testified through an interpreter. She testified that she could not answer the question whether she would let M.A. return to her home; however, she did answer in the affirmative the question whether she would protect the children in her home. When asked about her income, the maternal grandmother testified that she used to earn around $160 to $170 and she now makes $250; whether this figure is a weekly, biweekly, or monthly figure is not clear from her testimony. The maternal grandmother also testified that she received $600 per month in food stamps.
 

 DHR required both the mother and the maternal grandmother to undergo psychological evaluations, which were performed by Dr. Yolanda Suarez. Dr. Suarez testified at trial regarding the results of those evaluations. Dr. Suarez noted that the mother had shown a desire to avoid talking about and dealing with the sexual abuse she had suffered at the hands of M.A. In fact, according to Dr. Suarez, the mother mentioned that it upset her to be asked multiple questions about the incident and that she disliked having to recall the traumatic episode. Dr. Suarez said that the mother’s test results and clinical review did not reveal current symptoms of anxiety that are required for a diagnosis of post-traumatic stress disorder; however, Dr. Suarez noted that the mother’s avoidance of and reluctance to discuss the sexual abuse and her desire to minimize the recollections of the event were signs that might indicate a post-traumatic stress disorder. Thus, based on her evaluation, Dr. Suarez opined that the mother might be at risk for developing delayed post-traumatic stress disorder.
 

 Dr. Suarez testified that the maternal grandmother related during the evaluation that she did not blame M.A. for sexually abusing the mother because he was drunk. According to Dr. Suarez, the maternal grandmother said that she would consider letting M.A. return to the home upon his release from prison if he changed his behavior. Dr. Suarez stated that she did not think that the maternal grandmother was attempting to minimize what had happened to the mother but instead wanted to move forward and focus on forgiveness. Dr. Suarez indicated that the maternal grandmother had a positive attitude, which Dr. Suarez characterized as an “admirable altruistic behavior.” However, according to Dr. Suarez, the maternal grandmother’s reliance on positive thinking as a method of resolving the emotional and safety risks resulting from M.A.’s sexual abuse of the mother and Je.A. was “naive” and indicated the maternal grandmother’s lack of appropriate comprehension of safety risk factors for her children as well as the impact of the sexual abuse on their long-term welfare. Dr. Suarez opined that the maternal grandmother’s religious and cultural beliefs were interfering with her ability to recognize threats to the welfare of her children.
 

 “ ‘The right to maintain family integrity is a fundamental right protected by the due process requirements of the Constitution. Pursuant to this
 
 *1252
 
 right, Alabama courts recognize a presumption that parental custody will be in the best interests of a child. This prima facie right of a parent to the custody of his or her child can only be overcome by clear and convincing evidence that permanent removal from the parent’s custody would be in the child’s best interests, but the primary consideration in any proceeding to terminate parental rights is always the best interests and welfare of the child. In making that determination, the court must consider whether the parent is physically, financially, and mentally able to care for the child. If the court finds from clear and convincing evidence that the parent is unable or unwilling to discharge his or her responsibilities to and for the child, his or her parental rights can then be terminated, pursuant to [Ala. Code 1975,] § 26-18-7(a)
 

 “Bowman v. State Dep’t of Human Resources,
 
 534 So.2d 304, 305 (Ala.Civ.App.1988) (citations omitted).
 

 “A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights:
 

 (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights.
 
 Ex parte Beasley,
 
 564 So.2d 950, 954 (Ala.1990).”
 

 B.M. v. State,
 
 895 So.2d 319, 330-31 (Ala.Civ.App.2004).
 

 As noted above, a juvenile court’s judgment terminating parental rights must be supported by clear and convincing evidence. Bow
 
 man v. State Dep’t of Human Res.,
 
 534 So.2d 304, 305 (Ala.Civ.App.1988). “ ‘[C]lear and convincing evidence’ ” is “ ‘[ejvidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.’ ”
 
 L.M. v. D.D.F.,
 
 840 So.2d 171, 179 (Ala.Civ.App.2002) (quoting Ala.Code 1975, § 6—11—20(b)(4)). The juvenile court’s factual findings in a judgment terminating parental rights based on evidence presented ore tenus are presumed correct.
 
 R.B. v. State Dep’t of Human Res.,
 
 669 So.2d 187 (Ala.Civ.App.1995).
 

 Section 26-18-7(a), Ala.Code 1975, specifies the grounds for terminating parental rights:
 

 “If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents.”
 

 In deciding whether a parent is unable or unwilling to discharge his or her responsibilities to and for a child, the juvenile court may consider, but is not limited to considering, the following factors:
 

 “(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
 

 “(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for needs of the child.
 

 “(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to
 
 *1253
 
 torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
 

 “(4) Conviction of and imprisonment for a felony.
 

 “(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
 

 “(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
 

 “(7) That the parent has been convicted by a court of competent jurisdiction of any of the following:
 

 “a. Murder or voluntary manslaughter of another child of that parent.
 

 “b. Aiding, abetting, attempting, conspiring, or soliciting to commit murder or voluntary manslaughter of another child of that parent.
 

 “c. A felony assault or abuse which results in serious bodily injury to the surviving child or another child of that parent. The term ‘serious bodily injury’ means bodily injury which involves substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty.
 

 “(8) That parental rights to a sibling of the child have been involuntarily terminated.”
 

 Ala.Code 1975, § 26-18-7(a). In addition, when a child is not in the physical custody of the parent, the juvenile court shall consider:
 

 “(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
 

 “(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
 

 “(3) Failure by the parents to maintain consistent contact or communication with the child.
 

 “(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.”
 

 Ala.Code 1975, § 26-18-7(b).
 

 Because the mother is a 15-year-old minor who attends high school and has no income of her own, she admittedly cannot support or rear the child on her own. She is dependent on support from the maternal grandmother for her own existence. Thus, by virtue of her age and her situation, the mother is unable to discharge her parental responsibilities to and for the child, and, although that condition will eventually change, it will not change in the reasonably foreseeable future.
 

 Because the mother is a minor herself without the ability to parent her child on her own, DHR focused on whether placement in the family home under the supervision of the maternal grandmother was a viable alternative to termination of the mother’s parental rights. To achieve that end, DHR provided services to the mother and the maternal grandmother, including psychological evaluations, counsel
 
 *1254
 
 ing, and parenting classes. When its attempts to rehabilitate the family to the point of reunification failed, it moved to terminate the mother’s parental rights.
 

 The evidence at trial indicated that DHR’s attempt to utilize the maternal grandmother as an alternative to terminating the mother’s parental rights to the child failed because the maternal grandmother was resistant to the requirements DHR placed on her and resented the intrusion into the lives of her family members. As noted above, the maternal grandmother showed a reluctance to continue counseling for herself, indicating that the sexual abuse was in the past and that counseling was not necessary. Based on Dr. Suarez’ evaluation and the maternal grandmother’s reactions to parenting classes with Coello, the maternal grandmother evinced a lack of judgment regarding the impact of sexual abuse on her family and particularly upon the children involved. The maternal grandmother could not verify her income and was resistant to suggestions on how to do so; the parenting instructor, Coello, noted that the maternal grandmother seemed threatened by the intrusive questions regarding her income and family finances. The maternal grandmother’s own comments to Coello and to Dr. Suarez indicate that she did not find M.A.’s conduct to be his fault and that she did not think that her family had any problems requiring DHR’s intrusion into her family life.
 

 Although a juvenile court is required to consider alternatives to termination under
 
 Ex parte Beasley,
 
 564 So.2d at 954, the juvenile court is not required to accept any suggested alternative as “viable” simply because it exists. “We have recently explained ... that a ‘fit and willing’ relative is one who can care for the child’s physical, emotional, mental, and other needs during the child’s minority.
 
 J.B. v. Cleburne County Dep’t of Human Res.,
 
 991 So.2d 273, 283 (Ala.Civ.App.2008).”
 
 B.H. v. Marion County Dep’t of Human Res.,
 
 998 So.2d 475, 481 (Ala.Civ.App.2008). The determination of whether a viable alternative to termination exists in a given case is a question of fact.
 
 T.V. v. B.S.,
 
 7 So.3d 346, 352 (Ala.Civ.App.1998) (citing
 
 J.B.,
 
 991 So.2d at 282). Our review of a juvenile court’s decision on the viability of a particular alternative is governed by the ore tenus rule.
 
 T.V.,
 
 7 So.3d at 353.
 

 DHR based its decision to seek termination, at least in part, on the maternal grandmother’s attitude and inability to adjust her thinking and behavior to ensure a safe and stable environment for the child. The juvenile court concluded, based on its view of the evidence, that placing custody in the maternal grandmother was not a viable alternative to terminating the mother’s parental rights in this particular case. Specifically, the juvenile court endorsed DHR’s concerns regarding the maternal grandmother’s “protective capacities” and also accepted the testimony of Dr. Suarez regarding the maternal grandmother’s shortcomings. The juvenile court also found that the maternal grandmother did not “fully comprehend the emotional and mental trauma surrounding the child’s incestuous birth.”
 

 The juvenile court concluded, based on the totality of the evidence, that placement of the child with the maternal grandmother is not a viable alternative.
 
 See Montgomery County Dep’t of Human Res. v. C.R.,
 
 4 So.3d 1162, 1170 (Ala.Civ.App.2008) (indicating that the juvenile court is permitted to consider the totality of the evidence when determining whether children should be placed in a suggested alternative placement);
 
 J.B.,
 
 991 So.2d at 284 (same). The evidence at trial supports the juvenile court’s factual findings, and we are not permitted to reweigh the evidence to arrive at a different conclusion.
 
 Ex parte
 
 
 *1255
 

 R.E.C.,
 
 899 So.2d 272, 279 (Ala.2004). In fact, our supreme court has held that we must affirm the judgment of the juvenile court “
 
 ‘if
 
 under any reasonable aspect of the testimony,
 
 there is credible evidence
 
 to support the judgment.’ ”
 
 Ex parte R.E.C.,
 
 899 So.2d at 280 (quoting
 
 River Conservancy Co. v. Gulf States Paper Corp.,
 
 837 So.2d 801, 806 (Ala.2002)). We therefore affirm the termination of the parental rights of the mother.
 

 AFFIRMED.
 

 THOMPSON, P.J., and PITTMAN and BRYAN, JJ., concur.
 

 MOORE, J., dissents, without writing.
 

 [1]
 

 . Whether M.A. would be permitted by law to return to live in the family home is highly unlikely in light of Ala.Code 1975, § 15-20-26, which prohibits an adult criminal sexual offender from establishing a residence in certain locations, including those where a minor resides or where his or her former victim resides. The statute reads, in pertinent part:
 

 "O^) Unless otherwise exempted by law, no adult criminal sex offender shall establish a residence or any other living accommodation within 1,000 feet of the property on which any of his or her former victims, or the victims’ immediate family members reside.
 

 "(c) No adult criminal sex offender shall establish a residence or any other living accommodation where a minor resides. Notwithstanding the foregoing, an adult criminal sex offender may reside with a minor if the adult criminal sex offender is the parent, grandparent, or stepparent of the minor, unless one of the following conditions applies:
 

 "(1) The adult criminal sex offender’s parental rights have been or are in the process of being terminated as provided by law.
 

 "(2) The adult criminal sex offender has been convicted of any criminal sex offense in which any of the offender’s minor children, grandchildren, or stepchildren were the victim.
 

 "(3) The adult criminal sex offender has been convicted of any criminal sex offense in which a minor was the victim and the minor resided or lived with the offender at the time of the offense.
 

 "(4) The adult criminal sex offender has ever been convicted of any criminal sex offense involving a child, regardless of whether the offender was related to or shared a residence with the child victim.
 

 "(d) No adult criminal sex offender shall be permitted to willfully or knowingly come within 100 feet of any of his or her former victims, except as elsewhere provided by law, or make any visual or audible sexually suggestive or obscene gesture, sound, or communication at or to a former victim or a member of the victim’s immediate family.
 

 [[Image here]]
 

 "(h) An adult criminal sex offender who knowingly violates the provisions of this section shall be guilty of a Class C felony.”
 

 [2]
 

 . The oldest son, A.A., had at least part-time employment. According to Bankston, she had received one pay stub from A.A. The amount of income A.A. earned, however, was not disclosed in the record.