Rel: June 14, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2023-2024

———————————————

## CL-2023-0676 and CL-2023-0677

———————————————

## G.P.

## v.

## Dale County Department of Human Resources

## Appeals from Dale Juvenile Court
## (JU-21-41.03 and JU-21-42.02)

EDWARDS, Judge.

In February 2023, the Dale County Department of Human Resources ("DHR") filed in the Dale Juvenile Court ("the juvenile court") petitions seeking to terminate the parental rights of K.R. ("the mother")

and of G.P. ("the father") to A.E. and D.P. ("the children").[1] After two continuances, the juvenile court held a trial on the petitions on August 17, 2023. On September 7, 2023, the juvenile court entered a judgment in each action concluding that the mother and the father were "unable or unwilling to discharge their responsibilities to and for [each] child" and terminating their parental rights to each child. In those judgments, the juvenile court found "that the father had [had] ample time to show his ability and willingness to care for the child[ren] but that he [had] failed to do so" and that the father, despite having testified that he was not aware that the children had been in foster care, had "[known the] children were in foster care for nearly two years before he reached out to a caseworker." The juvenile court also found that the father had not provided material support for the children, that DHR had made reasonable efforts to rehabilitate the father, that no viable alternatives to the termination of the father's parental rights existed, and, specifically, that DHR had "explored all potential relative resources

---

[1]The petition relating to D.P. was assigned case number JU-21-41.03. The petition relating to A.E. was assigned case number JU-21-42.02.

without locating a suitable placement for the child[ren]." The father

timely appealed those judgments. The mother has not appealed.

The termination of parental rights is governed by Ala. Code 1975,

§ 12-15-319. That statute reads, in part:

> "(a) If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parent[] of a child [is] unable or unwilling to discharge [his or her] responsibilities to and for the child, or that the conduct or condition of the parent[] renders [him or her] unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parent[]. In a hearing on a petition for termination of parental rights, the court shall consider the best interests of the child. In determining whether or not the parent[] [is] unable or unwilling to discharge [his or her] responsibilities to and for the child and to terminate the parental rights, the juvenile court shall consider the following factors including, but not limited to, the following:
>
> > "....
> >
> > "(2) Emotional illness, mental illness, or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of a duration or nature as to render the parent unable to care for the needs of the child.
> >
> > "....
> >
> > "(4) Conviction of and imprisonment for a felony.

3

"....

"(7) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parent[] have failed.

"....

"(9) Failure by the parent[] to provide for the material needs of the child or to pay a reasonable portion of support of the child where the parent is able to do so.

"....

"(12) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."

The test a juvenile court must apply in a termination-of-parental-rights action is well settled:

"A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights. Ex parte Beasley, 564 So. 2d 950, 954 (Ala. 1990)."

4

B.M. v. State, 895 So. 2d 319, 331 (Ala. Civ. App. 2004). A juvenile court's judgment terminating parental rights must be supported by clear and convincing evidence. P.S. v. Jefferson Cnty. Dep't of Hum. Res., 143 So. 3d 792, 795 (Ala. Civ. App. 2013). "Clear and convincing evidence" is "'[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.'" L.M. v. D.D.F., 840 So. 2d 171, 179 (Ala. Civ. App. 2002) (quoting Ala. Code 1975, § 6-11-20(b)(4)). Although a juvenile court's factual findings in a judgment terminating parental rights based on evidence presented ore tenus are presumed correct, K.P. v. Etowah Cnty. Dep't of Hum. Res., 43 So. 3d 602, 605 (Ala. Civ. App. 2010), "[t]his court does not reweigh the evidence but, rather, determines whether the findings of fact made by the juvenile court are supported by evidence that the juvenile court could have found to be clear and convincing." K.S.B. v. M.C.B., 219 So. 3d 650, 653 (Ala. Civ. App. 2016). That is, this court

"'must ... look through ["the prism of the substantive evidentiary burden," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986),] to determine whether there was substantial evidence before the trial court to support a factual

finding, based upon the trial court's weighing of the evidence, that would "produce in the mind [of the trial court] a firm conviction as to each element of the claim and a high probability as to the correctness of the conclusion."'"

Id. (quoting Ex parte McInish, 47 So. 3d 767, 778 (Ala. 2008), quoting in turn Ala. Code 1975, § 25-5-81(c)).

The record reveals the following facts relating to the father. The father was late to the termination-of-parental-rights trial. The father's counsel explained that the father had believed that the trial was set to begin at 1:30 p.m. and that he was en route to the Dale County courthouse from his home in Vero Beach, Florida. The juvenile court concluded the testimony being offered by DHR and continued the trial to after the lunch break, permitting the father to appear at that time to present his own testimony.

Dominique Thomas, the DHR caseworker assigned to the cases at some point in early 2023, testified that she had intended to reach out to the father in the week following her assignment to the cases; however, she said, the father had contacted her before she had attempted to contact him. Thomas said that the father had told her that he had seen the children at the mother's house at some point during the pendency of the

6

dependency proceedings, which had apparently begun in 2021, and that he had been under the impression that the children were transitioning back into the home of the mother at that time.

Thomas explained that she had required the father to submit to both a hair-follicle drug test and a urine drug test in March 2023. She said that the father's urine drug test was negative for illegal substances but that he had tested positive for marijuana and cocaine on his hair-follicle drug test. According to Thomas, the father held a medical-marijuana card, but, she said, when she viewed the card in March 2023, she noticed that the expiration date on the card had passed. She said that he had denied regular use of cocaine but had admitted that he had tried it after the October 2022 death of his mother, for whom he had been caring during her terminal illness.

According to Thomas, the father had begun visiting the children after March 2023 and had visited A.E. once or twice and D.P. four times. She said that D.P. was 11 or 12 years old and indicated that he suffered from unspecified behavioral issues. She explained that "you can tell there's no real bond [between the father and D.P.]. [D.P.] wants a

7

relationship with [the father] but, because of the inconsistency on [the father's] part, there's really not much there." She also commented that D.P. had negative perceptions of the father that had been caused by information that the mother had provided to him. Thomas further explained that D.P. "wants to [return to the father's custody] but the negative perceptions kind of hinder him from just coming out with it." Regarding A.E., Thomas indicated that she desired to return to the father's custody. Thomas said that A.E. was nine years old.

Thomas testified that the father had disclosed a criminal history on the home-evaluation questionnaire that he had completed. Specifically, she testified that the father had been incarcerated for a 2012 robbery conviction in Indiana. She also noted that he had disclosed a 2014 conviction for failing to have a driver's license and convictions in 2017 and 2018 for possession of marijuana. Thomas testified that the mother had reported that her relationship with the father had included acts of domestic violence on his part, but no detailed evidence relating to the domestic-violence allegations against the father was presented.

When initially questioned about whether DHR had sought to complete a home study on the father through the Interstate Compact for the Placement of Children ("ICPC"), Ala. Code 1975, § 44-2-20 et seq., Thomas said that DHR had declined to request an ICPC home study from the Florida Department of Children and Families ("DCF") because, she said, the father had tested positive on his hair-follicle drug test. That fact, she said, would have resulted in a denial of the home study by DCF. However, Thomas later testified that

"[DHR] was not able to start [the ICPC process] because [DHR] had to wait for DNA testing. And [DHR was] waiting for [the father's] substances abuse results, and so whenever [DHR] got everything together, [the trial] was [set] within, like, two weeks. And so ICPC typically takes a while."

Victoria Shaw, a DHR supervisor, testified that DHR does not "send off for an ICPC because it's going to be denied at that proceeding state because of the drug concerns." She further explained that DHR could not pay for any services for the father, who resided in Florida, and indicated that DHR could not move forward with any plan for the father because of his residing in Florida and having no ICPC approval. Instead, she explained, the father would have to seek out and pay for any

9

recommended services in Florida. She stated, however, that DHR would complete an ICPC home study on the father if ordered to do so.

The home-evaluation questionnaire that the father had completed was admitted as an exhibit at the trial. The questionnaire listed the father's address and revealed that he lived with his girlfriend, K.C., and a 12-year-old "stepdaughter," J.M., in Vero Beach. According to the responses on the questionnaire, the father was employed by a tree-service company and had been so employed for four years. The questionnaire also contained the names of relatives of the father, including S.W., the father's sister; D.E., the father's brother; and C.G., an aunt of the father who lives in Alabama.

According to the father, he had not been aware that the children had been in the custody of DHR since February 2021. He said that, before visitation was reestablished in March 2023, he had last spoken to D.P. nearly two years before the trial and that, at that time, D.P. had been at the mother's house. However, he later admitted that he knew that DHR had removed the children from the mother's custody a second time. He also said that he had asked the mother if he needed to come and get the

children and that she had told him that she "would take care of it." The father said that he had not been able to focus on the children because he had been taking care of his mother, who had suffered from cancer, for approximately two years preceding her death in October 2022.

The father testified at the trial that he had been incarcerated for a robbery he had committed when he was 18 years old. He admitted that one of his convictions had, in fact, been for possession of cocaine. He denied, however, that he used cocaine, stating that it had been in the automobile with him and his "friend" at the time.

The father stated that he would be willing to submit to another hair-follicle drug test on the date of the trial. He explained that he would be negative for all substances other than marijuana, for which, he said, he had an active medical-marijuana card. At the conclusion of the trial, counsel for DHR indicated that DHR would be willing to submit an ICPC home-study request if the father passed his hair-follicle drug test. The father submitted to a hair-follicle drug test; the results again indicated that he was positive for cocaine metabolite and marijuana.

On appeal, the father challenges the sufficiency of the evidence supporting the juvenile court's conclusion that he is unable and unwilling to discharge his parental responsibilities to and for the children. He specifically contends that the record contains no evidence indicating that his potential use of any illegal substance impacts his ability to parent the children. See A.M. v. R.S., 373 So. 3d 215, 220-21 (Ala. Civ. App. 2022) (explaining that "a party seeking to terminate the parental rights of a parent based on that parent's drug use must establish that the parent's use of drugs impacts the parent's ability to perform the duties of a parent"); J.C. v. Madison Cnty. Dep't of Hum. Res., 293 So. 3d 901, 909 (Ala. Civ. App. 2019). The father also challenges the judgments insofar as the juvenile court concluded that DHR established that no viable alternative to the termination of his parental rights existed. He points out that DHR had not initiated the ICPC process, that DHR presented no evidence about his current circumstances, and that DHR had not presented evidence regarding the consideration and rejection of placement of the children with any relative resources identified by the

father as a potential alternative to the termination of the father's parental rights.

In its appellate brief, DHR presents the following argument in response to the father's contention that it failed to present clear and convincing evidence that no viable alternative to the termination of his parental rights existed:

"The record reflects that DHR personnel undertook an ICPC investigation in order to determine if placement with the father was a viable alternative to the termination of his parental rights. In J.A. v. Etowah Cty. Dep't of Human Res., 12 So. 3d 1245, 1254 (Ala. Civ. App. 2009), this Court determined that a juvenile court may base its determination as to whether a placement is a viable alternative to the termination of parental rights … on the totality of the evidence. In the underlying matter, placement with the father was not a viable alternative to the termination of parental rights. Thomas had also been unable to conduct a home evaluation of the father's residence. (R. 21.) She explained that the ICPC process had been started but would not be successful. (R. 21.) Thomas also explained the delay in the ICPC process including waiting for the DNA testing to confirm paternity and waiting on drug screening. (R. 31.) Additionally, Shaw explained that the delay in the ICPC process also related to substance abuse concerns. If an individual had an issue with substance abuse and tested positive, especially on a hair follicle screen, the ICPC … forms are not forwarded for processing because [the ICPC request] will be denied due to drug use concerns. (R. 48.). … [T]he father tested positive for cocaine and marijuana, clearly demonstrating that he had not addressed his drug abuse.

13

> Based on the foregoing, the trial court could have reasonably determined that there was no viable alternative to the termination of parental rights, given the remote possibility of the father addressing parenting deficiencies and achieving the requisite stability to safely care for the children after they had been in care for more than two years. S.B. v. State Dep't of Human Res., 743 So. 2d 470, 472 (Ala. Civ. App, 1992). Therefore, the trial court could have reasonably determined that no viable alternative to the termination of parental rights existed."

DHR's brief at 16-17.

Of course, the father does not argue that placement with <u>him</u> was a viable alternative to the termination of <u>his own</u> parental rights. DHR's response to the father's argument is illogical and does not answer the father's argument in any meaningful way.[2] DHR does not even acknowledge the legal principles applicable to the father's argument.

---

[2]We further note that DHR makes contradictory statements in that argument, stating both that DHR conducted an ICPC investigation and that it did not, and in other sections of its brief, including that it made reasonable efforts to rehabilitate the father, which, it says, failed, and that the father had failed to cooperate with services. Thomas testified that the father had complied with the request that he undergo a substance-abuse assessment but that DHR had not offered the father services recommended in the assessment because he lived in Florida. She stated that DHR was unable to pay for any services in another state. No other evidence contradicted that testimony.

We have often stated that, in addition to establishing the dependency of a child and that grounds for the termination of parental rights exist, "DHR must also present evidence indicating that there are no viable alternatives to the termination of a parent's parental rights." A.R.H.B. v. Madison Cnty. Dep't of Hum. Res., 378 So. 3d 543, 549 (Ala. Civ. App. 2022). We have also reiterated that "'DHR must present "evidence of recent attempts to locate viable alternatives in order to establish that termination of parental rights is the least [drastic] alternative."'" C.T. v. Calhoun Cnty. Dep't of Hum. Res., 8 So. 3d 984, 987 (Ala. Civ. App. 2008) (quoting V.M. v. State Dep't of Hum. Res., 710 So. 2d 915, 921 (Ala. Civ. App. 1998), quoting in turn Bowman v. State Dep't of Hum. Res., 534 So. 2d 304, 306 (Ala. Civ. App. 1988)) (emphasis omitted). Because DHR was petitioning for the termination of the father's parental rights in the present cases, DHR bore "'"the burden of proving the lack of a viable alternative by clear and convincing evidence."'" A.R.H.B., 378 So. 3d at 551 (quoting D.J. v. Etowah Cnty. Dep't Hum. Res., 351 So. 3d 1067, 1074 (Ala. Civ. App. 2021), quoting in

15

turn K.R.S. v. DeKalb Cnty. Dep't of Hum. Res., 236 So. 3d 910, 912 (Ala. Civ. App. 2017)).

The record in the present appeals does not contain such evidence. DHR failed to pursue an ICPC home study on the father's home and did not present testimony or other evidence indicating that DHR had contacted the relatives listed on the father's home-evaluation questionnaire. DHR also failed to present evidence indicating that Thomas or any other caseworker had asked the father to provide the names of any relatives that he might desire to be considered for placement of the children, much less that any DHR caseworker had contacted any of the father's relatives to see if they may be a possible resource for the children. Without such evidence, we are constrained to reverse the judgments of the juvenile court terminating the parental rights of the father to the children and to remand the cases to the juvenile court for that court to enter judgments denying DHR's petitions insofar as they requested termination of the father's parental rights. See A.R.H.B., 378 So. 3d at 551 (explaining that this court will reverse a judgment terminating parental rights when the record lacks evidence

indicating that efforts to locate and to investigate relatives were made); see also K.F. v. Millwood, [Ms. CL-2023-0393, Feb. 23, 2024] ___ So. 3d ___, ___ (Ala. Civ. App. 2024). Having concluded that the failure to present clear and convincing evidence that no viable alternative to the termination of the father's parental rights existed, we pretermit discussion of the father's other arguments on appeal. See J.M.S. v. B.M.H., 379 So. 3d 419, 424 n.2 (Ala. Civ. App. 2023) (indicating that this court may pretermit consideration of other issues raised on appeal when our resolution of one issue is dispositive of the appeal); L.M.W. v. D.J., 116 So. 3d 220, 223 (Ala. Civ. App. 2012) (same).

CL-2023-0676 -- REVERSED AND REMANDED WITH INSTRUCTIONS.

CL-2023-0677 -- REVERSED AND REMANDED WITH INSTRUCTIONS.

Hanson, Fridy, and Lewis, JJ., concur.

Moore, P.J., concurs in the result, without opinion.