PER CURIAM.
On January 13, 2005, the Limestone Juvenile Court terminated the parental rights of T.V. (“the mother”) to her then six-year-old son, N.V. (“the child”). The mother appealed to this court, and on October 7, 2005, we affirmed the judgment, without an opinion. T.V. v. B.S. (No. 2040406, October 7, 2005), 975 So.2d 1024 (Ala.Civ.App.2005) (table). The mother petitioned for, and the Alabama Supreme Court granted, certiorari review.
In Ex pa/ite T.V., 971 So.2d 1 (Ala.2007), the supreme court reversed the judgment terminating the mother’s parental rights, holding that the juvenile court had erred when it “failed to find by clear and convincing evidence that there was no viable alternative to terminating [the mother’s] parental rights.” 971 So.2d at 2. The court remanded the cause directly to the juvenile court “for a full consideration of viable alternatives to terminating ... [the mother’s] parental rights.” 971 So.2d at 10. On remand, the juvenile court held a hearing, considered viable alternatives to terminating the mother’s rights, and again entered a judgment terminating the mother’s parental rights, specifically concluding that there was no viable alternative to the termination. The mother now appeals to this court from that judgment.
The facts underlying the first termination proceeding were stated by our supreme court in Ex parte T.V., 971 So.2d at 2-3:
“[The mother] began using drugs in the 1980s and became addicted to crack cocaine in the 1990s. She continued to use crack cocaine while she was pregnant with [the child], her second child, who was born on June 2, 1999. While she was pregnant with [the child], [the mother] sought assistance from the Department of Human Resources (‘DHR’) because, as a result of her drug addiction, she was homeless, was without employment or transportation, and was unable to perform her parental duties. She was also facing criminal misdemean- or charges.
“Shortly after [the child’s] birth, DHR filed a dependency petition with regard to [the child] because of concerns about [the mother’s] homelessness, drug use, and incarceration pending the criminal charges. [The child] was adjudicated dependent, and an agreement was reached among [the mother], DHR, and B.S., an acquaintance of [the mother’s], that B.S. would have physical custody of [the child] and that [the mother] would be allowed visitation as agreed between B.S. and [the mother]. There was a one-year period following the adjudication of dependency during which DHR attempted to reunite [the mother] and [the child]. DHR prepared an individual service plan (TSP’) addressing [the mother’s] housing and drug problems, but it could not prepare a home study because [the mother] was homeless. [The mother] failed to comply with drug treatment recommended by the ISP; instead, she agreed to the permanent placement of [the child] with B.S. The next year, the trial court with jurisdiction over the dependency petition vested permanent legal and physical custody of [the child] in B.S., with [the mother’s] consent, although the trial court retained jurisdiction to reopen the custody award. The award of permanent custody marked the end of DHR’s involvement in the case; at that time [the mother] was still addicted to crack cocaine.
“Both the court’s order and the record in the termination-of-parental-rights case establish that [the mother] has now met the goals DHR originally set for her. She is no longer homeless, and she *348 has dealt with her drug problem. She reconciled with and married D.R.V., the father of her first child. Through involvement with their church, [the mother] and D.R.V. have quit using illegal drugs. [The mother] testified that she has been drug-free since July 20, 2002. [The mother] ministers to people with substance-abuse problems. She has maintained employment since July 20, 2002, with short interruptions. She has voluntarily contributed small amounts to [the child’s] support; these amounts total $270 since 2004.
“[The mother] testified that she first attempted to reestablish visitation with [the child] in 2002. She asserts that she understood that ‘B.S. was willing to help her in raising her son during the period of her drug addiction but would be willing to help facilitate the reunification of mother and child should [the mother] overcome her drug addiction.’ [The mother’s] brief at 8-9. However, according to [the mother], B.S. and her husband, C.S., discouraged the reunification, not returning [the mother’s] telephone calls or responding to notes [the mother] left at B.S.’s house. On ‘numerous occasions,’ [the mother] claims, she went to B.S.’s residence to see [the child], but B.S. would leave the residence with him and not allow [the mother] to visit him. C.S. testified, to the contrary, that [the mother] visited [the child] only four to six times from 1999 to 2000, and that, from 2000 until the petition was filed in March 2004, she did not visit at all.
“Believing that B.S. was resisting her efforts to reunite with [the child], [the mother] moved the trial court for visitation rights; the trial court awarded her one hour of supervised visitation each week. In March 2004, B.S. filed in the trial court the current petition to terminate [the mother’s] parental rights. [The mother] moved the court for additional visitation, but it terminated her parental rights before ruling on her motion.”
On remand from the supreme court, the juvenile court held a hearing on May 7, 2007. The evidence established that the child had, since he was 5 days old, lived with B.S., C.S., and their two daughters, who were 6 and 10 years old at the time of the remand hearing. The child believes that B.S. and C.S. are his parents and that their daughters are his sisters. He has not been told that T.V. is his biological mother, and he has not asked why his surname is the same as hers. C.S. and B.S. both testified that they believed that it is not in the child’s best interest to visit with the mother. C.S. stated that the mother had “shown a constant disregard for the child,” and he questioned whether the mother could do anything for the child “other than confuse him even more.”
B.S. presented evidence indicating that two years earlier, during the period when the judgment terminating the mother’s parental rights was on appeal, the mother had been arrested for driving under the influence of alcohol (“DUI”) and had been convicted of the amended charge of reckless endangerment. The mother testified that she had overcome her drug problem, and she insisted that she did not have an alcohol problem. She estimated that she had drunk alcohol in moderation only four to six times during the previous two years. She testified that on the occasion of her arrest for DUI she had attended an outdoor concert where, she said, it was hot and she had “had a few beers with friends.” She stated that there were no children in the car with her when she left the concert.
The mother is 45 years old, is a high school graduate, and has had 2 years of *349 college. She testified that she had lived at the same address with her husband and their 18-year-old son for the past 7 years. She and her husband married in January 2003, although, she said, they had been together for 22 years; her husband is the father of her older son. The mother is employed as a quality auditor at Matsu of Alabama, an automotive parts manufacturer, where she works the 11:00 p.m. to 7:00 a.m. shift and earns $12.50 per hour. The mother said that at Cinram, her previous place of employment, which she had recently left for better pay and better benefits, she had been subjected to drug tests numerous times and had tested “negative” each time.
The mother testified that, with one exception, she had not seen the child since December 2004. The exception was in January 2005, when she went to visit her pastor’s wife, a teacher at the school the child attends. On that occasion, the mother asked B.S., who was also at the school that day, if she could speak with the child when he came out of the building at the end of the day. B.S. agreed and the mother “told [the child] hello and asked him if he remembered [her].... [She] asked him how he was doing and that was about it.” On cross-examination, the mother acknowledged that she had “held herself out to the school officials as [the child’s] mother.”
Susan McGrady, a protective-services caseworker for the Limestone County Department of Human Resources (“DHR”), testified that DHR had moved to intervene in the proceeding after the cause was remanded by the Alabama Supreme Court. She stated that DHR stood ready to assist with “finding viable options for the child,” but, she said, she had not received any requests for assistance. The parties agreed to continue the hearing to allow for taking the depositions of two expert witnesses — Pam Locke, M.Ed., a licensed professional counselor, and Danny Blanchard, Ph.D., a psychologist. The juvenile court subsequently admitted the depositions in evidence.
Pam Locke testified that DHR had engaged her to supervise visitation between the mother and the child in 2004 and that the mother had paid her to conduct additional, individual sessions with the child. Locke first saw the child in the home of B.S. and C.S. on August 30, 2004, when the child was five year's old. She saw the child at his school on two additional occasions in September 2004. The first of the mother’s five visits with the child occurred at the DHR office on September 21, 2004. Locke said that before the first visit she had cautioned the mother to move slowly, to be patient, not to reveal her true relationship to the child, and not to pressure the child into premature intimacy. Locke testified that she had introduced the mother to the child as “a special member of [his] family.” Locke said that the first visit went well, with the mother and the child giving each other “high fives,” playing a card game, and reading a story together. Locke stated that she was surprised when the mother asked the child for “a hug,” because that request was not in compliance with the instructions she had given the mother, but, Locke said, the child did not seem to be upset and had suffered no harm. Locke testified that she thought the mother had “pushed the limits” and had been “in a big hurry to connect with [the child]” on two other occasions — once when the mother brought a camera to the visitation and suggested that the child “take a picture of [his] mama” — but, Locke said, the child did not react to that request and Locke thought that the child might not have heard it. Locke stated that she thought a bond was forming between the mother and the child until the October 7, 2004, visit when, she said, the child informed her that B.S. had told him that he *350 could not come back for another visitation. According to Locke, the child did, however, return for another visit on October 14, at which time he said that his surname was the same as the surname of B.S.
Locke was of the opinion that introducing T.V. to the child as his mother would have a traumatic effect on the child and would necessitate extensive, long-term counseling. She said that, if the child were told that T.V. was his biological mother, he should be told when he is older; she suggested that he not be told before his preteen years. Locke acknowledged that she was not attuned to the legal rights of parents in such cases and that her primary concern was to protect the emotional state of children. When asked whether she thought it was in the child’s best interest to expose him to T.V. as his mother, Locke replied that, if she discounted the “legal aspect,” her answer was “no.”
Dr. Blanchard testified that B.S. and C.S. had consulted him in March 2007 to discuss their concerns about the apparent intent of the mother to gain custody of the child after nine years. Dr. Blanchard met with B.S. and C.S. on two occasions for a total of two and one-half hours. He spoke with the child for a total of 20 minutes. Dr. Blanchard testified that if a child is removed from the parent figures with whom he has bonded in his early years, the child will become confused, distant, hostile, and possibly aggressive. With respect to the possibility of removing the child from B.S. and C.S., with whom the child had resided since shortly after his birth, Dr. Blanchard explained:
“This is a child that’s been living with a family for nine years, no knowledge of his mother, no understanding of who she is, or his father, for that matter, biologically speaking. It would be pretty traumatic. It can work, but you’re looking at long-term therapy. ...
“The adjustment success is poor, especially if the child begins to ask questions as to why [his biological parent] rejected [him] in the first place: ‘Why didn’t you keep me when I was born ... ? What prevented you, despite whatever problems you may have been having, from keeping me?’ And it puts the parent in an uncomfortable situation too, to be fair about it.”
Dr. Blanchard gave his opinion that it would be in the child’s best interest to “leave well enough alone ... to stay where he is and to live a life that is conducive [to] growth and development.” He testified, however, that if the child were to be told that T.V. is his mother, that revelation should come only when the child is older, perhaps when he is between 11 and 15 years of age. At that point, Dr. Blanchard said, the child, the mother, and the child’s caregivers all would need therapy, which would entail “a great deal of expense, a lot of trauma, and a lot of heartbreak.” Dr. Blanchard recommended against telling the child that T.V. is his mother, but he added:
“[I]f you do it and the courts overrule what I say, I would make sure that they [are] aware that this is going to be a long-term process with a lot of feelings being hurt and a lot of anger and hostility.”
When Dr. Blanchard was informed that a counselor, Locke, had identified the mother to the child as “a special member of [the child’s] family,” Dr. Blanchard expressed disagreement with that approach, stating: “I’ve never experienced anything like that. ... I’m not saying it is deceptive, but I don’t want to mislead a little boy thinking [he is] visiting with someone and it’s not [his] parent.” Finally, Dr. Blanchard opined that, even if the child were told the truth about his parentage, he should continue to live with B.S. and C.S. and the *351 mother should be allowed conditional visitation, subject to her participating in therapy and abiding by a safety plan.
On July 6, 2007, the juvenile court entered a judgment containing the following findings and conclusions on the issue whether there was a viable alternative to terminating the mother’s parental rights:
“Evidence presented at [a hearing on remand by the supreme court] revealed that following the termination hearing and during the appellate process the mother was arrested for Driving Under the Influence of Alcohol and pleaded guilty to the amended charge of Reckless Endangerment. [The mother’s] family was examined to determine if there were viable family alternatives to raise [the child] but most lived in other states and had never had any contact with the child and very little contact with [the mother]. No family member of the mother’s came before the Court offering their home for the child. Eight years after the petition for dependency was filed, [the mother] gave the name of [the child’s] father despite the record reflecting that paternity was inquired into and testing was done when the case began in 1999. The Court was not furnished with viable family alternatives in the newly divulged putative father’s family.
“Dr. Danny Blanchard’s deposition reflects that in his expert opinion it would not be in the child’s best interest to take the child out of the home [of B.S. and C.S.] and visitation with his mother at this time in the child’s life would require ‘a great deal of expense, a lot of trauma, and a lot of heartbreak.’ Pam Locke, the child’s counselor, stated that it would have a very traumatic effect on [the child] if he were to discover that [B.S. and C.S.] were not his parents and that someone else is his mother. Ms. Locke testified that her recommendation would be to wait until the child is older to confront the child with transitioning [the mother] into his life.
“Based on full consideration of clear and convincing evidence presented [on remand], the Court finds that there are no viable alternatives to the termination of parental rights of the mother. Expert testimony has been provided to the Court that return of custody of the child to the mother is not in the child’s best interests and that letting the child stay with [B.S. and C.S.] and visiting with his mother would be traumatic and disruptive to the child at this time. It would appear that that arrangement is not a viable alternative to termination because in JU-99-127.01 in addition to the mother’s request for visitation she also asks for the child’s custody to be returned to her and that motion remains pending so that it is not an alternative for the ‘status quo’ to remain unchanged.
“In addition, the Court does not find that letting [the mother] have visitation with [the child] while remaining in the custody of [B.S. and C.S.] is a viable alternative to terminating her parental rights. On pages 33, 41, and 54 of her deposition, Ms. Locke testified that [the mother] was not fully compliant with the counselor’s recommendations regarding visitation procedures needed for the child. The Court also has concerns regarding [the mother’s] ability to pay for the long-term and intensive counseling and therapy that has been recommended if visitation and reintegration of [the child] into her life continued.”

Standard of Review

Appellate review of a juvenile court’s decision concerning the existence of a viable alternative to termination of pa *352 rental rights is governed by the following principles:
“The determination of whether a viable alternative to termination of parental rights exists is a question of fact to be decided by the juvenile court. See Ex parte J.R., 896 So.2d 416 (Ala.2004). On appeal from ore tenus proceedings in a termination-of-parental-rights case, this court presumes that the juvenile court’s factual findings regarding viable alternatives are correct. See J.C. v. State Dep’t of Human Res., 986 So.2d 1172, 1183 (Ala.Civ.App.2007). However, because of the serious nature of a judgment severing a familial relationship, see L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002), this court conducts a ‘careful search of the record’ to determine whether such findings are supported by clear and convincing evidence. In re Moore, 470 So.2d 1269, 1270 (Ala.Civ.App.1985). See also Columbus v. State Dep’t of Human Res., 523 So.2d 419, 421 (Ala.Civ.App.1987); and Santosky v. Kramer; 455 U.S. 745 (1982). ‘Clear and convincing evidence’ is ‘ “[evidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.” ’ L.M. v. D.D.F., 840 So.2d at 179, citing in turn Ala.Code 1975, § 6-11-20(b)(4).”
J.B. v. Cleburne County Dep’t of Human Res., 991 So.2d 273, 282 (Ala.Civ.App.2008).

Analysis

In Ex parte T.V., our supreme court decided that the juvenile court’s finding that the child was dependent and the juvenile court’s conclusion that the statutory grounds for termination outlined in § 26-18-7, Ala.Code 1975, had been proven were not plainly and palpably wrong. 971 So.2d at 6. The supreme court determined, however, that preserving the status quo — with B.S. and C.S. maintaining custody while the mother visits and tries to establish a bond with the child — might be a viable alternative to termination of the mother’s parental rights that the juvenile court had not considered. The supreme court reached that decision based on the following evidence and ai'gument presented at the first termination proceeding:
“The only expert testimony was that [the mother] was making progress in establishing her relationship with [the child], that a bond appeared to be emerging between them, and that a strong relationship could grow if it were nurtured. Further, the child’s guardian ad litem argued that she did not believe it to be in [the child’s] best interests to terminate [the mother’s] parental rights. She pointed out that [the child] had, in effect, two families attempting to meet his needs and to give him affection. She also pointed out that an alternative to terminating [the mother’s] parental rights was to maintain the status quo, by which she meant that visitation would continue while permanent legal and physical custody would remain in B.S.”
971 So.2d at 8. The supreme court, therefore, remanded the cause to the juvenile court “for a full consideration of viable alternatives to terminating ... [the mother’s] parental rights.” 971 So.2d at 10. The juvenile court’s judgment on remand indicates that it fully considered viable alternatives to terminating the mother’s parental rights and concluded that preserving the status quo was not a viable alternative because it was not in the child’s best interest.
The evidence at the hearing on remand demonstrated that both Dr. Blanchard and Locke believed that it would be traumatic *353 for the child even to learn that T.V. was his mother, much less to be removed from the custody of B.S. and C.S., with whom he had lived for all of his nine years. Both experts opined that it would not be in the child’s best interest to be told of his true parentage at the present time and recommended that, if the child were ever told, he should be told during his preteen years or when he is 11 to 15 years of age. Dr. Blanchard’s testimony implied that visitation between the mother and the child should occur only if the child were not misled as to the mother’s true identity, thereby apparently ruling out immediate visitation. Both experts agreed that whenever truthful information about the mother was imparted to the child, the revelation would cause trauma, anger, and heartbreak to the child and would necessitate extensive and expensive therapy, not only for the child, but also for the mother as well as for B.S. and her family members.
The ore tenus presumption of correctness does not apply to the juvenile court’s assessment of the testimony of Dr. Blanchard and Locke because they testified by deposition and the juvenile court did not have the opportunity to observe their demeanor firsthand. See Safeway Ins. Co. v. Bailey, 748 So.2d 218, 221 (Ala.Civ.App.1999). Nevertheless, the juvenile court was entitled to accord great weight to the testimony of the two mental-health professionals because they each independently reached the same conclusion with respect to the viability of continuing the status quo — i.e., allowing the mother to visit the child and to try to develop a bond with him while B.S. and C.S. maintained custody; both experts determined that that course of action was not in the child’s best interests. Moreover, the juvenile court expressed doubt as to whether the status quo could be maintained in light of the mother’s pending motion for a return of custody and the mother’s “hurry to connect with [the child]” in disregard of Locke’s instructions not to reveal her true relationship to the child and not to pressure the child into premature intimacy.
We conclude that the juvenile court considered and rejected, based on the clear, convincing, and uncontroverted evidence of two experts, the alternative of allowing the mother to visit the child while he remained in the custody of B.S. and her family because that alternative would not be in the child’s best interests. It is axiomatic that an alternative to termination cannot be “viable” unless it promotes the best interests of the child. See D.M.P. v. State Dep’t of Human Res., 871 So.2d 77, 97 (Ala.Civ.App.2003) (plurality opinion) (rejecting two individuals as viable alternatives to termination of parental rights because, among other things, there was no evidence indicating that those individuals had ever visited or had any relationship with the child, that they would be fit custodians for the child, or that “such a placement would be in the child’s best interest ” (emphasis added)). See also J.C. v. State Dep’t of Human Res., 986 So.2d 1172, 1196 (Ala.Civ.App.2007) (rejecting as a viable alternative to termination an individual who had “never showed a willingness to care for the child and did not testify at the termination hearing”); J.B. v. Jefferson County Dep’t of Human Res., 869 So.2d 475, 484 (Ala.Civ.App.2003) (plurality opinion) (rejecting paternal great-aunt and great-uncle as viable alternatives because they waited two ■ years to indicate their wish to be considered as custodians and, in the meantime, the child “had formed a de facto parent-child relationship with his foster parents, who desired to adopt him and who he knew as his ‘mama’ and ‘daddy’ ”); B.S. v. Cullman County Dep’t of Human Res., 865 So.2d 1188, 1196-97 (Ala.Civ.App.2003) (rejecting sister of mother’s second *354 husband as a viable alternative because the child was unfamiliar with husband’s sister and other members of husband’s family, sister was first mentioned by mother as possible alternative at termination hearing itself, and mother’s last-minute questioning of husband’s sister to determine whether she would be willing to serve as a placement for child was not sufficient to demonstrate that she was a viable alternative); and Z.G. v. State Dep’t of Human Res., 717 So.2d 801, 803 (Ala.Civ.App.1998) (dismissing maternal uncle as a viable alternative because he had declined to serve as a custodian 10 years earlier and the children had had no contact with him in the meantime).
As in A.J.H.T. v. K.O.H., 983 So.2d 394 (Ala.Civ.App.2007), the mother has evidently overcome a drug dependency and succeeded in improving her life, but her absence from the life of the child for four and one-half years has a consequence. As Judge, now Justice, Murdock stated in his dissent in K.W.J. v. J.W.B., 933 So.2d 1075, 1081 (Ala.Civ.App.2005), rev’d, 933 So.2d 1081 (Ala.2005):
“[C]hildren grow. They are read to and tucked in at night. They are nursed to health. They are taught. They are nurtured. They are loved. And they love back. And bonds are formed — but not with a [mother] who has allowed [herself] to remain absent from the [children’s lives].”
(Quoted in A.J.H.T., 983 So.2d at 402.) In A.J.H.T., the children were old enough at the time their mother abandoned them to know her and to have been detrimentally affected by her prolonged absence. In the present case, the child has never known his mother, and her reappearance in his life after a total absence would, according to the clear and convincing testimony of two experts, not be in his best interests. We therefore affirm the judgment of the Limestone Juvenile Court concluding that there is no viable alternative to terminating the mother’s parental rights.
AFFIRMED.
THOMPSON, P.J., and PITTMAN, J., concur.
BRYAN and THOMAS, JJ., concur specially.
MOORE, J., concurs in the result, with writing.