MOORE, Judge.
D.V. (“the mother”) and W.C.C., Sr. (“the father”), separately appeal from a judgment of the Colbert Circuit Court terminating their parental rights to W.C.C., Jr. (“the child”), who was born on March 20, 2008. We affirm.

Background

In April 2008, the Colbert County Department of Human Resources (“the Colbert County DHR”) filed in the Colbert Juvenile Court (“the juvenile court”) a dependency petition asserting that the child had tested positive for narcotics at his birth and that two safety plans that had *372 been put into place by the Colbert County DHR with the mother had failed.[1] That dependency action was assigned case no. JU-08-141.01. The Colbert County DHR was awarded custody of the child, and the child was placed with foster parents, L.S. and T.S., who lived in Lauderdale County. L.S., the foster father, was at that time and at all times relevant to this appeal employed by the Lauderdale County Department of Human Resources (“the Laud-erdale County DHR”); he supervises caseworkers assigned to the foster-care and protective-care units in the Lauderdale County DHR office.
On July 14, 2009, the Colbert County DHR filed a petition seeking to terminate the parental rights of the mother and the father to the child. That termination petition was assigned case no. JU-08-141.02.
On February 4, 2010, after an ore tenus hearing, the juvenile court entered a judgment terminating the parental rights of the mother and the father. The mother and the father separately appealed from that judgment to this court.[2] The juvenile court determined that the record could not be certified as adequate for an appeal, and, as a result, this court, pursuant to Rule 28(D), Ala. R. Juv. P., transferred the cause to the Colbert Circuit Court (“the circuit court”) for a trial de novo. The circuit-court action was assigned case no. CV-10-107; however, the parties also refer to the proceedings before the circuit court as case no. JU-08-141.03.
Beginning in November 2011 and concluding in February 2012, the circuit court conducted a four-day ore tenus hearing on the Colbert County DHR’s petition to terminate the parental rights of the mother and the father. On March 8, 2012, the circuit court entered its judgment finding that the child was dependent; that the mother and the father were unable or unwilling to discharge their duties to and for the child; that the parents’ conduct or condition was unlikely to change; that the Colbert County DHR had made reasonable efforts to rehabilitate the mother and the father but that those efforts had failed; and that no viable alternatives to termination of the parents’ parental rights existed that would promote or be consistent with the child’s best interests or foster his need for permanency.[3] Both the mother and the father timely appealed. We have consolidated the appeals.
2110590 — The Mother’s Appeal
The mother appeals, arguing that the evidence at trial was insufficient to establish grounds for termination and the lack of a viable alternative to termination of her parental rights. The mother also maintains that the circuit court erred in receiving evidence from DHR workers who, she alleges, had a patent conflict of interest.

Grounds for Termination

Section 12-15-319, Ala.Code 1975, a part of the Alabama Juvenile Justice Act (“the AJJA”), § 12-15-101 et seq., Ala. Code 1975, provides, in pertinent part:
“(a) If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their respon *373 sibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child and to terminate the parental rights, the juvenile court shall consider the following factors including, but not limited to, the following:
[[Image here]]
“(2) ... excessive use of alcohol or controlled substances, of a duration or nature as to render the parent unable to care for needs of the child.”
The mother contends that the circuit court improperly terminated her parental rights because, she says, the Colbert County DHR based its petition solely on her alleged drug dependency, which, she claims, was not proven to be continuing at the time of the trial. See D.O. v. Calhoun Cnty. Dep’t of Human Res., 859 So.2d 439, 444 (Ala.Civ.App.2003) (“evidence of current conditions or conduct relating to a parent’s inability or unwillingness to care for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence”).
The undisputed evidence in the record indicates that the child tested positive for methadone and marijuana at birth, indicating that the mother had used those drugs while pregnant. Following his birth, the child remained hospitalized for two weeks to deal with the effects of his exposure to narcotics in útero. After that two-week period, the mother moved in with the father under the supervision of W.R., one of the mother’s maternal aunts, pursuant to a safety plan developed by the Colbert County DHR. After receiving reports of gunfire in the home from W.R., the Colbert County DHR implemented a new safety plan requiring the mother and the child to reside with D.T., another of the mother’s maternal aunts, without the father. That plan failed, according to Chasity Butler, a Colbert County DHR social worker, when the mother left the child locked in a bedroom with Da.V., her oldest child, where D.T. could not reach the child. At that point, the Colbert County DHR took the child into custody and placed the child in foster care.
Angel Geiske, the director of Turning Leaf Therapeutic and Social Service Providers, testified that she had performed a substance-abuse assessment on the mother at the request of the Colbert County DHR. Based on the information provided by the mother, Geiske concluded that the mother could participate in an intensive outpatient-treatment program, but, Geiske testified, she also had determined that, if the mother was not maintaining abstinence from opiates/opioids and marijuana, the mother would need to complete an inpatient-treatment program. Geiske testified that, based on her evaluation, she concluded that the mother was at high risk of addictive behaviors.
Butler testified that, although the mother had agreed to enroll at the “Freedom House” inpatient-treatment program in June 2008, the mother elected to participate in an outpatient-treatment program instead. The Colbert County DHR admitted into evidence a letter dated April 20, 2009, from Beth Sweat, the program coordinator of Freedom House. In that letter, Sweat stated that, although the mother had graduated from Freedom House’s outpatient program, the mother had experienced issues while participating in the outpatient program and had failed to report obtaining repeated refills of pain medi *374 cations and using pain medication on other occasions. As a result, Sweat stated that she had recommended that the mother complete a residential-rehabilitation program.
Butler also testified that the mother had relapsed in 2009 and that Freedom House and the Colbert County DHR had insisted that the mother complete an inpatient-treatment program but that the mother had refused, again choosing to complete an outpatient program. Butler testified that completion of an inpatient-treatment program remained a part of the Colbert County DHR’s requirements for the mother up until the termination hearing, but, she said, the mother had not complied with that requirement.
According to the mother, she could not be admitted to an inpatient-treatment program without failing a drug screen, and, she said, she did not want to test positive. The mother testified that she had completed two outpatient-treatment programs, one at Freedom House and another at “River-Bend.” Records from Turning Leaf, which were introduced into evidence, established that Turning Leaf had conducted 27 drug screens on the mother between April 28, 2008, and May 5, 2011. According to Geiske, nine of those screens had been “specimen positive” for some narcotic or drug and three had been “inferred positives.” [4] The remaining 15 of the mother’s 27 drug screens had been negative.
The mother testified that she had disputed the results of many of those 12 positive drug screens and that, as a result of what she described as repeated false positives on those drug screens, she grew distrustful of the Colbert County DHR’s drug screeners. The mother testified that, to prove that the results of the Colbert County DHR’s drug screens were inaccurate, she had submitted to drug screens conducted by independent drug screeners and that those drug screens had come back negative. She admitted that, at some point, she had refused to submit to any further drug screens by the Colbert County DHR’s agent, but, the mother testified, she had offered to obtain an independent drug screen whenever the Colbert County DHR wanted one. According to Geiske, however, the mother’s independently obtained drug screens had not specifically tested for methadone as had the drug screens performed by Turning Leaf.
According to the mother, the Colbert County DHR had not attempted to rehabilitate her or to reunite her with the child since 2009. The mother testified that the Colbert County DHR had not sought a drug screen from her for at least six months preceding the termination hearing. The mother admitted that, three months before the termination hearing, she had obtained a narcotic pain medication from her physician for her back pain; she testified, however, that she was taking that medication only when needed.[5]
Butler, however, testified that the mother had admitted to “being back on opiates, which she has been documented numerous times to being an opiate addict.” Butler acknowledged that the mother had a prescription for the opiates, but, Butler testified, that usage was considered to be a relapse because the mother was an opiate *375 addict. Butler also testified that the mother had refused a total of eight drug screens between the December 2009 termination hearing in the juvenile court and May 2011. Butler acknowledged that, as of May 2011, the Colbert County DHR had stopped sending a technician to the mother’s residence to perform drug screens because of safety concerns prompted by the intimidating and threatening behaviors of the mother and her paramour, L.R., with whom the mother was living. Butler explained that the mother had refused to submit to a drug screen as recently as February 2012 at the North Alabama Visitation Center, where she exercised visitation with the child.
Based on the foregoing evidence, the circuit court reasonably could have been clearly convinced that the mother suffers from an addiction to opiates that had directly harmed the child while in útero and that continued to expose the child to harm even up to the time of the trial. See M.H. v. Jefferson Cnty. Dep’t of Human Res., 42 So.3d 1291, 1294 (Ala.Civ.App.2010) (“If a fact-finder reasonably could have been clearly convinced from the evidence in the record that a parent is unwilling or unable to discharge his or her parental responsibilities to and for the child, this court may not reverse a judgment terminating parental rights arising from ore tenus proceedings in a termination-of-parental-rights case.”). The mere fact that the Colbert County DHR did not obtain a positive drug test from the mother showing she had abused illegal drugs in the two years preceding the trial on its petition to terminate the mother’s parental rights, as the mother argues, does not require this court to ignore the other evidence tending to prove that the mother had not overcome her addiction to legal drugs by the time of the trial, which evidence the circuit court obviously found clear and convincing.
The mother nevertheless contends that her parental rights could not be terminated because she is currently exercising custody of her two other children, one of which was born after the child, with the approval of the Franklin County Department of Human Resources (“the Franklin County DHR”). The mother argues that it would be inconsistent for the State to conclude that she is capable of caring for her two other children while at the same time finding her incapable of caring for the child such that her parental rights should be terminated.
The evidence relating to that argument shows that the mother has two other children who were living with her and L.R., her paramour, in Franklin County at the time of the trial. The older child was 15 at the time of the trial, and the younger child was 2. According to the mother, the Franklin County DHR had opened dependency cases on those children and had placed “FOCUS” workers in the home to supervise the mother’s parenting. At some point, the mother testified, those children had been returned to her unrestricted custody based, in part, on the FOCUS reports. Neither party introduced any records from FOCUS, the Franklin County DHR, or the Franklin Juvenile Court in regard to the other children, and neither party presented any evidence regarding the conditions and circumstances under which those children were residing at the time of the trial.
The mother has not directed us to any statute or caselaw that prevents a court from terminating a parent’s parental rights to one child solely because the parent is currently exercising custody as to other children. See Rule 28(a)(10), Ala. R.App. P. Admittedly, it appears inconsistent for a court to terminate a parent’s parental rights to one child while that parent retains those rights as to other chil *376 dren. However, the record does not indicate that the Franklin County DHR or the Franklin Juvenile Court had the same information and evidence before it as was presented at the adjudicatory hearing before the circuit court. The record also does not reveal whether the Franklin County DHR and the Franklin Juvenile Court had additional evidence that was not presented in the adjudicatory hearing in this case that enabled them to reach their opinion, if indeed they did, that the mother could safely and independently parent the other two children. Even if all concerned State agencies considered the identical evidence, the mother would have this court assume that any error in creating this seemingly inconsistent situation lies with the circuit court in this action, rather than with the Franklin County authorities. However, as we have previously determined, the circuit court had before it sufficient evidence to sustain its judgment terminating the mother’s parental rights. Thus, we reject the mother’s contention that the circuit court erred in terminating her parental rights for the above-stated reason.

Viable Alternatives

The mother asserts that the circuit court erred in finding that no viable alternatives existed because, she says, the Colbert County DHR failed to properly authenticate certain home studies and, as a result, failed to admit those home studies into evidence. The circuit court, however, allowed Butler to testify that the Colbert County DHR had received the home studies of R.R. and T.R., the paternal aunt and uncle, and L.D. and B.D., the father’s niece and her husband, but that neither of those homes had been approved.
After objecting to the circuit court’s consideration of the contents of the home studies, the mother’s attorney cross-examined Butler regarding the contents of the home studies. Because the mother elicited the very testimony to which she now objects, if the circuit court’s consideration of that information was error, it was invited error. See McKinley v. McKinley, 277 Ala. 471, 172 So.2d 35 (1965) (recognizing that a party cannot complain on appeal that the trial court considered an issue that that party consented to submit to the trial court). It is well settled that “ ‘[a] party may not predicate an argument for reversal on “invited error,” that is, “error into which he has led or lulled” ’ ” the pertinent adjudicative body. Wood v. State Pers. Bd., 705 So.2d 413, 422 (Ala.Civ.App.1997) (quoting Atkins v. Lee, 603 So.2d 937, 945 (Ala.1992), quoting in turn Dixie Highway Express, Inc. v. Southern Ry., 286 Ala. 646, 651, 244 So.2d 591, 595 (1971)). We, therefore, find no reversible error in the circuit court’s consideration of the home studies.
The mother also asserts that the Colbert County DHR failed to obtain psychological evaluations of the relatives to corroborate their alleged lack of protective capacity that had been identified in the home studies. The mother, however, has failed to establish that the Colbert County DHR was required to offer expert testimony on that issue. Although she relies on J.A. v. Etowah County Department of Human Resources, 12 So.3d 1245 (Ala.Civ.App.2009), and E.S.R. v. Madison County Department of Human Resources, 11 So.3d 227 (Ala.Civ.App.2008), neither of those cases supports her argument that DHR is required to obtain expert testimony when excluding relative resources as a placement option on the basis of a lack of protective capacity.

Conflict of Interest

Finally, the mother asserts that the circuit court exceeded its discretion in considering evidence offered by DHR’s employ *377 ees who, she alleges, had a conflict of interest. She asserts that Ala. Admin. Code (Dep’t of Human Res.), Rule 660-5-B9-.06, prohibits employees of DHR who have a conflict of interest from participating in dependency cases and that, because such a conflict existed in this case,[6] the circuit court should not have accepted testimony from those witnesses employed by or affiliated with DHR and the foster parents.[7] Assuming without deciding that the administrative rule upon which the mother relies supports her argument, the mother failed to sufficiently apprise the circuit court of her argument.
Although the mother’s attorney questioned whether the foster father believed a conflict of interest existed, the mother did not cite to the circuit court the administrative rule on which she relies and failed to argue that, because such a conflict existed, the circuit court should not consider testimony offered by anyone employed by or affiliated with DHR. As a result, the mother’s argument on this point is not properly preserved for appellate review. See Andrews v. Merritt Oil Co., 612 So.2d 409, 410 (Ala.1992) (“This Court cannot consider arguments raised for the first time on appeal; rather, our review is restricted to the evidence and arguments considered by the trial court.”); and Etherton v. City of Homewood, 700 So.2d 1374, 1377-78 (Ala.1997) (quoting Bevill v. Owen, 364 So.2d 1201, 1203 (Ala.1979)) (“ ‘It is a fundamental rule of appellate procedure that, regardless of [the] merits of [the] appellant’s contentions, appellate courts will not review questions not decided by the trial court.’ ”).
2110591 — The Father’s Appeal

Grounds for Termination

The father initially challenges the circuit court’s judgment finding grounds to terminate his parental rights. The father asserts that he completed all the objectives established for him by the Colbert County DHR, i.e., he successfully completed an intensive outpatient-treatment program, he voluntarily reduced his narcotic medication, he successfully completed a parenting class, and he maintained contact with *378 the child by regularly visiting him. Thus, the father asserts, the evidence failed to establish any grounds for terminating his parental rights.
The evidence in the record establishes that the father was released from prison in 2005 after serving close to 30 years for bank robbery and the revocation of his parole. Since being released, the father had not been involved in criminal activity, but he had been arrested in 2008 for driving while intoxicated; that charge was later reduced to reckless driving.[8]
The father was not employed at the time of the trial, but he was receiving disability income as a result of arthritis and a back and knee injury he had sustained while he was in prison. According to the father’s physical evaluation that had been completed for the Social Security Administration, his back pain was worsened by “sitting, straining, lifting, or attempted overhead activity.” The father testified that, because of his physical problems, he cannot run. The father had been prescribed Xa-nax and Oxycontin to treat his conditions, but, the father testified, he had asked for a milder pain medication to appease the Colbert County DHR’s concerns about his medication intake. The father, however, testified that he still needed the stronger medication to properly treat his pain, and he admitted at the termination hearing that he was addicted to his pain and anti-anxiety medications.
The father testified that he had participated in “Individualized Service Plan” (“ISP”) meetings with the Colbert County DHR and that the Colbert County DHR had asked him to take parenting classes, which he had successfully completed, and to submit to a substance-abuse evaluation, which he also had done. As a result of that evaluation, the father had been referred to intensive outpatient treatment. Although the father did not attend the specific program that the Colbert County DHR had recommended, he testified that he had participated in and completed an outpatient substance-abuse program that he described as more rigorous than the one that had been recommended by the Colbert County DHR; the father also testified that he had submitted to random drug screens.
According to the drug screens that were admitted into evidence, the father had produced positive drug screens for opiates, benzodiazepines, cocaine, and marijuana. Although the father had prescriptions for the opiates and benzodiazepines, he admitted that he was addicted to those narcotics. The father also testified that the positive result for cocaine and marijuana had been in error. Despite that testimony, the father admitted to having smoked marijuana after being released from prison, but he denied that he had inhaled. He denied ever having used cocaine.
Butler testified that, during the father’s visits, the child often removed himself from the play situation because, she believed, the father’s interaction with the child was “very aggressive” and “very loud and abrasive.” Butler also testified that the father had often made inappropriate remarks to the child and had physically *379 interacted with the child in such a way that the visitation monitor or the Colbert County DHR caseworker had felt it necessary to intervene in the visit.
Based on the foregoing evidence, the circuit court reasonably could have been clearly convinced that the father continued to suffer from an addiction to narcotic pain medication of such duration that it rendered him unable to properly parent the child. See § 12-15-319(a)(2). We acknowledge that other evidence conflicted with such a finding, but the circuit court, as the trier of fact, resolved that dispute against the father. We must defer to the circuit court’s interpretation of the evidence. See J.C. v. State Dep’t of Human Res., 986 So.2d 1172 (Ala.Civ.App.2007).

Viable Alternatives

The father also challenges the circuit court’s finding that no viable alternatives to termination of his parental rights existed. He asserts that R.R. and her husband, T.R., and L.D. and her husband, B.D., were two viable alternatives to termination of his parental rights; he also asserts that maintaining the status quo, with the child in foster care, was a viable alternative. As this court previously has recognized, however:
“Although a juvenile court is required to consider alternatives to termination under Ex parte Beasley, 564 So.2d [950] at 954 [ (Ala.1990) ], the juvenile court is not required to accept any suggested alternative as ‘viable’ simply because it exists. ‘We have recently explained ... that a “fit and willing” relative is one who can care for the child’s physical, emotional, mental, and other needs during the child’s minority. J.B. v. Cleburne County Dep’t of Human Res., 991 So.2d 273, 283 (Ala.Civ.App.2008).’ B.H. v. Marion County Dep’t of Human Res., 998 So.2d 475, 481 (Ala.Civ.App.2008). The determination of whether a viable alternative to termination exists in a given case is a question of fact. T.V. v. B.S., 7 So.3d 346, 352 (Ala.Civ.App.1998) (citing J.B., 991 So.2d at 282). Our review of a juvenile court’s decision on the viability of a particular alternative is governed by the ore tenus rule. T.V., 7 So.3d at 353.”
J.A., 12 So.3d at 1254.
Although it appears from the evidence in the record that R.R. and T.R. clearly desired to have custody of the child, the circuit court heard testimony from which it could reasonably have been clearly convinced that their ages and their alleged inability to understand the father’s limitations and drug issues prevented them from serving as an appropriate placement resource for the child.
According to the foster mother, R.R. and T.R. had shown interest in obtaining custody of the child in April 2009, when, she explained, the mother had suffered a relapse of her drug addiction and the Colbert County DHR had changed the permanency plan for the child to relative placement. The foster mother testified that she, R.R., and T.R. had disagreed at times as to the proper care to be provided to the child and that she questioned whether R.R. could discern when the child was ill and whether she could properly care for the child when the child was ill. She also stated that she believed R.R. had allowed the father and other family members to smoke while holding the child or while in the child’s immediate presence, which was contraindicated for the child’s asthma. She also testified that, according to R.R., the child “had stopped breathing” on one occasion at R.R.’s house, but no one had called for medical assistance or taken the child to the doctor.
The foster mother expressed other concerns regarding the child’s visiting with R.R. and T.R. at their home. She testified *380 that, on several visits, the father had been intoxicated and, even though he had been visibly shaking, R.R. had defended him. The foster mother also expressed concern about so many family members and relatives coming in and out of R.R.’s house. Finally, the foster mother testified that she believed R.R., who was in her mid 60s, and T.R., who was estimated to be 85, were too old to raise or care for the child. Thus, clear and convincing evidence supports the circuit court’s finding as to R.R. and T.R.
As to L.D. and B.D., the evidence establishes that they are younger, in good health, employed in the education field, have no health or drug issues, have no criminal histories, and have a son only a year or two older than the child. However, the circuit court received evidence indicating that the mother had written a letter to the Colbert County DHR in which the mother alleged that L.D. and B.D. had assisted the father in selling and hiding drugs and guns.[9] Also, Butler explained that the Colbert County DHR had received an anonymous report indicating that the father had engaged in a drug deal in L.D.’s front yard while the child was visiting there. Butler admitted that she did not know who had made that report and that the allegations could not be confirmed. Butler also testified that, after learning of those allegations, L.D. and B.D. had withdrawn as a potential resource for the child. Additionally, the foster mother testified that she had many of the same concerns with them as she had with R.R. and T.R.
Although the home of L.D. and B.D. appeared to offer a suitable placement resource for the child, L.D. admitted that she had withdrawn as a potential resource before the termination petition was first heard in the juvenile court. The record contains no indication that L.D. ever contacted the Colbert County DHR to indicate a renewed interest in serving as a placement resource, and there was no indication that L.D. had continued to visit with the child or to otherwise maintain a bond or relationship with him. Therefore, as the trier of fact, the circuit court could have rejected L.D.’s expressed interest in obtaining custody of the child as a last-minute alternative to termination. See, e.g., C.T. v. Calhoun Cnty. Dep’t of Human Res., 8 So.3d 984, 989 (Ala.Civ.App.2008) (affirming the trial court’s finding that a relative suggested as a placement resource for the first time at the termination hearing was not a viable alternative to termination); and B.S. v. Cullman Cnty. Dep’t of Human Res., 865 So.2d 1188, 1196-97 (Ala.Civ.App.2003) (accord). Because the evidence supports the circuit court’s finding, our deferential standard of review mandates that we accept it even if we might have reached a different conclusion.
Finally, we reject the father’s argument that maintaining the status quo was a viable alternative to termination of his parental rights. The child, who is now 4 years old, has been in foster care since he was 18 days old. Based on the evidence, it appears that both the mother and the father continue to take narcotics. The father admitted that he is addicted to his narcotic medications; the mother is living with L.R., who is, according to the record, a convicted drug offender, she has refused to attend an inpatient-treatment program, and, in the year preceding the termination *381 hearing in circuit court, she continued to fail drug screens or to refuse to submit to required drug screens. As we have previously recognized: “At some point, ... the child’s need for permanency and stability must overcome the parent’s good-faith but unsuccessful attempts to become a suitable parent.” M.W. v. Houston Cnty. Dep’t of Human Res., 773 So.2d 484, 487 (Ala.Civ.App.2000); see also K.A.P. v. D.P., 11 So.3d 812, 820 (Ala.Civ.App.2008) (“[T]he appellate courts generally hold that maintaining an indefinite custody arrangement with a third party is not in the best interests of the child.”). We, therefore, reject the father’s argument that maintaining the status quo is a viable alternative to termination of the father’s parental rights.

Conclusion

Based on the foregoing, we affirm the circuit court’s judgment.
2110590 — AFFIRMED.
2110591 — AFFIRMED.
THOMPSON, P.J., and PITTMAN, BRYAN, and THOMAS, JJ„ concur.

. The father’s paternity had not been adjudicated at that time.

. R.R. and T.R., the child’s paternal aunt and uncle, who had been allowed to intervene in the termination action in the juvenile court, also filed a notice of appeal from the February 4, 2010, judgment.

.On March 23, 2012, the circuit court entered an amended judgment, making clerical corrections to the March 8, 2012, judgment, pursuant to Rule 60(a), Ala. R. Civ. P.

. Geiske explained that an "inferred positive" indicated that the mother had refused to be screened or had not returned Turning Leaf's call within a certain period and that, pursuant to the agreement entered into by the mother, Turning Leaf inferred that she would have tested positive if she had submitted to the test. Geiske testified that the time allowed for the return call was set by agreement.

. It is unclear whether the mother’s testimony was intended to refer to the November 2011 or to the February 2012 hearing date.

. As stated previously, the foster father was employed by the Lauderdale County DHR as a supervisor. The mother maintains that several witnesses testifying on behalf of the Colbert County DHR, therefore, had a conflict of interest.

. Ala. Admin. Code (Dep’t of Human Res.), Rule 660-5-39-.06, provides, in pertinent part:
"(1) A child-placing agency with authority to approve foster homes and to place children in approved foster family boarding homes or foster family free homes shall:
[[Image here]]
“(e) The State Department of Human Resources, Family Services Partnership, Office of Foster Care, is to be notified when a DHR employee. State Office or County Office, or DHR Official makes application to become a foster care provider. The homes of DHR Officials or DHR employees shall not be approved for use as a foster home provider if there is a possible conflict of interest situation, e.g., personnel that engage in the placement or supervision of foster children, or personnel that regulate the licensing or approval of homes or facilities for the placement of children. The State Department of Human Resources will provide a written statement regarding whether there is a possible conflict.
"(f) A licensed child-placing agency shall not conduct or approve a foster home study on any of its employees or officials, which includes board members, volunteers or anyone else who has direct affiliation with the agency. Arrangements must be made with another licensed child-placing agency or licensed social worker to conduct and approve the study, make a placement, provide post-placement supervision and for reapproval of the home.”
(Underlining and bold typeface in original.)

. The father first testified that his arrest for driving while intoxicated had occurred in 2002. The father, however, was in prison until 2005. He then testified that he was arrested in December 2007 and that he remembered the date because the Colbert County DHR was placing a significant amount of pressure on him in connection with this case. The child, however, was not born until March 2008, so the Colbert County DHR would not have been involved with the father as a result of this case in December 2007. Subsequent testimony at the hearing established that the father’s arrest for driving while intoxicated occurred in December 2008.

. The mother testified that she had written that letter based on the foster mother's advice and with the foster mother’s help, but she stated that the allegations were false and that she actually approved of L.D. and B.D. as relative placements. The foster mother denied the mother’s account.